*Traimne Martinez Allen v. State*, No. 16, September Term 2014, and *Howard Bay Diggs v. State*, No. 17, September Term 2014, Opinion by Greene, J.

**CRIMINAL LAW – STATUTORY INTERPRETATION – DNA COLLECTION ACT – PUB. SAFETY ART. § 2-510 – ADMISSIBILITY OF DNA MATCH EVIDENCE**

Md. Code (2003, 2011 Repl. Vol., 2014 Cum. Supp.), § 2-510 of the Public Safety Article ("PS") provides that "[a] match obtained between an evidence sample and a data base entry may be used only as probable cause and is not admissible at trial unless confirmed by additional testing." The plain language of the statute requires that before evidence of a DNA data base "match" may be admitted at trial, the party seeking its admission bears the burden of ensuring that additional testing of the DNA samples is completed to confirm the validity of the match. Such requirement applies equally to a criminal defendant offering evidence of a DNA match to another individual. Such a restriction on the admissibility of evidence does not violate the accused's constitutional right to present a fair defense.

IN THE COURT OF APPEALS
OF MARYLAND

Nos. 16 and 17
September Term, 2014

---

TRAIMNE MARTINEZ ALLEN

v.

STATE OF MARYLAND

---

HOWARD BAY DIGGS

v.

STATE OF MARYLAND

---

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
Watts
Wilner, Alan M. (Retired, Specially
    Assigned),

JJ.

---

Opinion by Greene, J.

---

Filed: November 26, 2014

In this case, we address whether a criminal defendant may introduce at trial evidence of a DNA "match" to prove the identity of another individual without first establishing additional confirmatory testing pursuant to Md. Code (2003, 2011 Repl. Vol., 2014 Supp.), § 2-510 of the Public Safety Article ("PS"). PS § 2-510 provides that "[a] match obtained between an evidence sample and a data base entry may be used only as probable cause and is not admissible at trial unless confirmed by additional testing." Based on the plain language of the statute, we answer the question posed in the negative. Because of the common issues of law and fact, we have consolidated two criminal cases involving co-defendants for the purpose of this opinion.[1]

## FACTUAL AND PROCEDURAL HISTORY

Following a seven-day jury trial in the Circuit Court for Montgomery County, Petitioners, Traimne Martinez Allen ("Allen") and Howard Bay Diggs ("Diggs"), were convicted of attempted first degree murder, first degree burglary, robbery with a deadly weapon, attempted robbery with a deadly weapon, conspiracy to commit robbery, two counts of first degree assault, and two counts of using a handgun in the commission of a crime of violence, stemming from a home invasion and robbery that occurred on the night of June 23,

---

[1] We granted separate petitions for certiorari in *Allen v. State*, 436 Md. 327, 81 A.3d 457 (2013) and *Diggs v. State*, 436 Md. 327, 81 A.3d 457 (2013). Each case was argued separately before this Court.

2009.[2]  This incident involved the following cast of characters: Allen, Diggs, and Alex "Gutta" Harris (the perpetrators); Sentayehu Negussie and Jeremy Gordon (the victims); and Lazoya "Suave" King and Shavon Jackson (the girlfriends).  The relevant facts adduced at trial were as follows:[3]

At the time of the incident, Jackson, King, Gordon, and Negussie had known each other for about one year.  For much of that time, Jackson was involved in a romantic relationship with Gordon, and King was involved in a romantic relationship with Negussie.  Gordon and Negussie shared an apartment, and all four spent time there.  At some point prior to the June 23, 2009 incident, both romantic relationships ended poorly.  Jackson thereafter began dating Harris, and King began dating Diggs.

During the day on June 23, 2009, Jackson and Harris discussed "robbing somebody" for "money or drugs."  Jackson and King nominated Gordon and Negussie as potential targets, because those two were known to keep a supply of drugs and cash at their apartment.  Jackson, King, Diggs, and Harris met later that day at Jackson's apartment.  There, they devised and rehearsed a plan whereby the women would invite themselves to "hang out" at Gordon and Negussie's apartment and, once there, opened the door so that Diggs and Harris

_____

[2] Although the wheels of this criminal enterprise began turning during the afternoon of June 23, 2009, the home invasion and robbery actually took place after midnight, in the early morning hours of June 24, 2009.

[3] The State's primary witness at trial was Jackson, who testified pursuant to a plea agreement whereby she ultimately pled guilty to first degree burglary, robbery with a deadly weapon, and first degree assault.  The victims, Gordon and Negussie, also testified at trial pursuant to an immunity agreement.  They admitted to both distributing and using drugs.

could access the apartment to commit the robbery. The group "did a little act out" of the plan: Diggs and Harris would barge into the apartment, order the occupants to the floor at gunpoint, tie up Gordon and Negussie, throw a few punches and kicks for good measure, and then search the apartment for the intended loot. King called Negussie, who agreed to pick them up later that evening at a nearby Metro station.

At approximately 9:00 p.m. that evening, Allen joined the group. Driving a green Buick, Allen picked up Jackson, King, Diggs, Harris, and Chantel Fletcher, Jackson's cousin, who had arrived sometime that afternoon. The group drove to the area surrounding Gordon and Negussie's apartment, apparently to conduct reconnaissance prior to the planned attack. Allen then dropped off Jackson, King, and Fletcher at the Metro station to await Gordon and Negussie. Fifteen minutes or so later, Gordon and Negussie arrived by car at the Metro station and picked up all three women. They proceeded to drive around, procured some drugs, and used the drugs while in the vehicle. Meanwhile, Jackson communicated with Harris about their progress via text messages. After an hour or two, Gordon, Negussie, and the women went to Gordon and Negussie's apartment. Jackson was the last to enter and left the apartment door unlocked. She then alerted Harris that they had arrived.

Shortly thereafter, Harris, Diggs, and Allen, wearing bandanas over their faces, barged through the door into Gordon and Negussie's apartment. Diggs was waving a handgun and ordered everyone to "get down." Diggs and Harris then bound Gordon's and Negussie's hands behind their backs using duct tape, and kicked and punched them while on the floor.

3

Meanwhile, Allen, wearing a Pittsburgh Pirates baseball hat, was running in and out of bedrooms searching for and taking any items of value. Diggs apparently "pistol whipped" Gordon, who resisted, and both Gordon and Negussie were stabbed in the arm with a knife. Once the victims were restrained, Harris, Diggs, and Allen proceeded to collect various items in the apartment. The women fled the apartment at some point during the robbery. Gordon managed to escape from his duct tape binding and ran towards the sliding glass backdoor of the apartment. Shots were fired, shattering the glass door. Gordon ran through the shattered glass and was hit by a bullet in his lower back.

Meanwhile, unbeknownst to anyone involved in the robbery scheme, plain clothes officers of the Montgomery County police department were present in the area as part of an undercover investigation regarding a series of recent automobile thefts. Prior to the robbery at the apartment, two officers observed the green Buick parked on a side street and Harris, Diggs, and Allen standing behind it. Subsequently, several officers followed Harris, Diggs, and Allen, in the green Buick, to a nearby 7-Eleven convenience store. The men entered the 7-Eleven store, where they continued to be observed by officers in the vicinity.[4] While they were inside, another officer observed the contents of the Buick, which included a backpack, one black and one red bandana, two pairs of sneakers, and one pair of white gloves. The

---

[4] The men were also depicted in the store's surveillance video, which was admitted into evidence at trial and included several frames of their faces. The video showed the men purchasing three pairs of gloves from the store, and at least one of the men was smiling and laughing.

officers observed the Buick return to the side street but park in a different location than it had been previously.

Another officer, Sergeant Wyne, was posted near Gordon and Negussie's apartment. He observed a black Hyundai arrive at the apartment complex, and saw Gordon and the three women exit the Hyundai and enter the apartment. Five to ten minutes later, Sergeant Wyne observed the green Buick race through the apartment parking lot and go "around the corner," where another officer saw the Buick park and three men, "hoodies up," exit the Buick and "jog over" to and enter the apartment building. One of the men was wearing a backpack. Shortly thereafter, the officers saw three women "scurrying" away from the apartment building and heard two rounds of gunshots.

Harris, Diggs, and Allen chased Gordon out of the apartment, but apparently gave up their pursuit, and Gordon was met by Sergeant Wyne, who had approached the apartment after hearing the gunfire. Noticing that Gordon was bleeding profusely from his mid-section, Sergeant Wyne called for medical assistance. Recognizing Gordon as one of the individuals who had walked into the apartment from the Hyundai, Sergeant Wyne also issued a radio broadcast to look out for the three women. Additional officers arrived on the scene, and, upon entering the apartment, found Negussie bound and bleeding on the floor. Meanwhile, Harris, Diggs, and Allen ran back to the Buick, but fled when additional officers arrived. An officer apprehended Harris, but neither Diggs nor Allen were apprehended at that time. The three women had walked to the nearby 7-Eleven, where they were also arrested.

In completing their investigation of the June 23-24, 2009 incident, officers recovered various items from the apartment, the Buick, and the surrounding area. Of the numerous items collected by the police, DNA samples were taken from five of the items: two black bandanas (one found on a sidewalk and one found in the apartment stairwell), a Pittsburgh Pirates baseball hat, a black t-shirt, and an orange juice bottle. The Montgomery County Crime Laboratory analyzed the DNA samples and compared them to samples taken from the suspects and the victims. When there was no match, the laboratory uploaded the resulting DNA profiles to the Federal Bureau of Investigation's ("FBI") Combined DNA Index System ("CODIS").[5] The baseball hat produced a mixture of DNA profiles, the major contributor of which was determined to be Allen. In addition, two samples, one taken from one bloodied black bandana and one from the orange juice bottle, yielded DNA profiles that "matched" DNA records in CODIS associated with individuals other than any of the participants in the June 23, 2009 incident. Specifically, a DNA sample taken from the bloodied black bandana produced a "match" to a DNA profile of an individual named Richard Debreau, which had been previously uploaded to CODIS by the Montgomery County Crime Laboratory. In addition, a sample taken from the orange juice bottle produced a "match" to a DNA profile of an individual named Mohamed Bangora, which had been

---

[5] "CODIS" is defined by PS § 2-501(c) as "the Federal Bureau of Investigation's 'Combined DNA Index System' that allows the storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories[,]" and "includes the national DNA index administered and operated by the Federal Bureau of Investigation."

previously uploaded to CODIS by the Maryland State Police.

During a pre-trial motions hearing, Allen's counsel proffered to the court that Richard Debreau was a known gang member who had recently pled guilty to a "nearly identical type of robbery" as in the present case. The defense sought to have the other DNA samples taken from the crime scene compared to Debreau's DNA, because, according to Allen's counsel, "the more Richard Debreau DNA found on the scene, the more exculpatory I suggest this may well be." Allen's counsel further stated that he had submitted a request to have the Montgomery County Crime Laboratory compare all of the "unknown" DNA samples taken from the scene to Debreau's DNA profile, but the laboratory had denied the request. The prosecutor argued that the testing of additional unknown samples was unnecessary, and that the State was aware of its continuing obligation to turn over any additional discovery if new evidence arose. The court then denied Allen's general motion to compel on the ground that the defense was getting all of the discovery entitled to it. Defense counsel made no additional requests for testing of Debreau's DNA.

On the morning of trial, the defense moved *in limine* to prevent the State from mentioning in its opening statement that the defendants were gang members. The State advised that it would not do so, but reserved the right to introduce evidence regarding gang affiliation and practice among members if the defense introduced evidence about Debreau's DNA on the bandana taken from the scene. Specifically, the State proffered that it would introduce evidence regarding the use of "robbery kits," a practice in which gang members

purposefully deposit items containing the DNA of others at crime scenes. The judge asked who would introduce evidence of Debreau's DNA. Defense counsel responded that, if the State did not, they intended to call Naomi Strickman, a forensic specialist employed by the Montgomery County Crime Laboratory to introduce the evidence.[6] The trial judge denied the defense's motion, stating that if the jury was "entitled to consider [evidence of Debreau's DNA], they might also be entitled to consider why it's on there."

In its case-in-chief, the State did not call an expert to present any DNA evidence. At the conclusion of its case-in-chief, however, the State moved *in limine* to preclude the defense from questioning Strickman about CODIS matches and specifically about the DNA profile matches to Debreau and Bangora. The State argued that such testimony would be inadmissible for three reasons: (1) Strickman lacked personal knowledge to testify regarding the DNA profile matches, because she did not complete the DNA profile comparison herself; (2) PS § 2-510 prohibits the admission of DNA matches at trial without additional confirmatory testing, which was not done in this case; and (3) the DNA evidence would be irrelevant without the addition of statistical data.

Outside the presence of the jury, Allen's counsel examined Strickman on the record. Her testimony with regard to the match to Debreau's DNA profile was as follows:

> ALLEN'S COUNSEL: . . . [Y]ou are employed by the Montgomery County

---

[6] Ms. Strickman had been identified originally by the State as a potential expert witness, however, the prosecutor stated that Ms. Strickman probably would not be called by the State because the DNA evidence was not particularly helpful to the State.

8

Police Crime Laboratory as a Forensic Scientist, correct?

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: And you, your work is mainly in the area of DNA examinations, is –

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: – that correct? And you conducted a series of examinations related to this specific case, is that correct?

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: Now, there was an item identified as OS7, a black bandana that you examined, is that correct?

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: And it's my understanding that you found blood stains on that item?

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: Is that accurate?

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: And it's my further understanding, based upon your report, that the blood stains were excluded as having come from [the defendants, the victims, and the victims' other roommate], is that correct?

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: And that the profile of the blood stains [was] submitted to CODIS –

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: – for the purposes of further, I guess, evaluation?

9

MS. STRICKMAN: Correct.

ALLEN'S COUNSEL: Is that accurate?

MS. STRICKMAN: Yes.

ALLEN'S COUNSEL: All right. Now, would you tell the [c]ourt what you learned with regard to that further evaluation of the blood stain on OS7?

MS. STRICKMAN: Yes. The DNA profile that was obtained from the blood stain, from OS7, was entered into CODIS, which is just a database of DNA profiles from individuals. And when that profile was searched, it was found to be consistent with a DNA profile of a known individual.

ALLEN'S COUNSEL: Okay. And what did CODIS do in response to that to notify you?

MS. STRICKMAN: This was a, a local hit, meaning it was a hit to a DNA profile within our local database, so profiles entered by the Montgomery County Crime Lab. So, when the profile was entered, the notification of the hit was as soon as the profile was entered.

ALLEN'S COUNSEL: Okay. The fact that it was a local hit, could you tell the [c]ourt what that means with respect to who submitted the hit, which lab, and whether that lab, first, who submitted that profile?

MS. STRICKMAN: The profile was submitted by another analyst in the Montgomery County Crime Lab.

* * * *

ALLEN'S COUNSEL: Once the local hit, you were informed of the local hit, did you take any further action with respect to the sample, the DNA profile you had, the unknown profile in that local hit?

MS. STRICKMAN: Once the local hit was, one the local hit was notified, then the investigator was sent a supplemental report that addressed the hit from that DNA profile from OS7 to the individual that was entered by the other analyst. And it was explained that this was investigative information, and then any connection to the individual would have to be done through further

10

investigation, and they could request additional statistical calculation and comparisons.

**ALLEN'S COUNSEL: Well, so, specifically, was any additional testing done**?

**MS. STRICKMAN: No.**

ALLEN'S COUNSEL: Why not?

MS. STRICKMAN: This was, again, it's investigative information, so it has to be further investigated to determine if there is a connection to this individual, and if then they would need the comparison done with the individual's profile to the evidence profile.

ALLEN'S COUNSEL: Okay. . . . When I refer to additional testing, was there any confirmatory testing to the CODIS hit against the original sample from the unknown person, which I will just say we know for the record is Richard Debreau?

MS. STRICKMAN: No.

(Emphasis added). In addition, Strickman acknowledged that additional or confirmatory testing could have been done on the Debreau sample upon request, because the Montgomery County lab had the original known sample.[7] The same was not true for the Bangora sample, because the original had been submitted by the Maryland State Police. With regard to the Bangora match, Ms. Strickman testified that:

---

[7] Strickman's testimony appears to be consistent with the "Supplemental Report" from the Montgomery County Police Crime Laboratory regarding the "match" to the DNA profile of Debreau, which stated that "[t]his information is provided only as an investigative lead. Any possible connection or involvement of this individual to the case must be determined through further investigation. . . . Statistical calculations and DNA comparisons to the DNA profiles previously obtained can be conducted upon request."

11

When we have a notification of a hit through the CODIS hit computer [at the Maryland State Police level], there isn't any identifying information associated with notification, so we send a request for the match confirmation to the Maryland State Police. . . . [The State Police then] rerun the individual sample to confirm the DNA profile. . . . We have to wait for the confirmation from Maryland State Police to then proceed with issuing a report to the investigator, providing the name of the individual, and then requesting the known sample [from the State Police] for direct comparison. . . . [W]e have the sample run within our laboratory. . . . [a]nd then can do the direct comparison between that known DNA sample to our evidence profile.

Ms. Strickman further stated that the laboratory made no request to the Maryland State Police for submission of the known sample, therefore, there was no "direct comparison" analysis completed on the samples related to the Bangora match.

The trial court then granted the State's motion, stating that "for the reasons articulated by the State, [Ms. Strickman] is not a competent witness to testify as an expert concerning DNA testing of Mr. Debreau and Mr. Bangora[.]" Allen's counsel moved for a mistrial, or in the alternative, a continuance to allow further development of the evidence. The trial court denied the motion, stating that "the [c]ourt finds that the Defense did have the opportunity, if it so wanted, to test this evidence[,] . . . [a]nd furthermore, [Ms. Strickman] is not the proper witness for the kind of testimony that you're referring to."

Subsequently, Strickman testified before the jury that Allen and Diggs were excluded as a possible source of the DNA on several pieces of evidence, including the bloodied bandana and the orange juice bottle. At the conclusion of Strickman's testimony, Allen's counsel proffered to the court that, "had the DNA evidence been permitted to be presented in full regalia," the defense would have offered a photograph of Debreau as well as the

12

transcript in the matter of *State v. Debreau*, in which Debreau pled guilty to a robbery described as a "home invasion drug-rip style robbery" approximately two weeks after the robbery in this case. The court accepted the proffer but did not amend its earlier ruling to exclude the testimony.

At the conclusion of trial on April 5, 2010, the jury convicted Allen and Diggs of attempted first degree murder, first degree burglary, robbery with a deadly weapon, attempted robbery with a deadly weapon, conspiracy to commit robbery, two counts of first degree assault, and two counts of using a handgun in the commission of a crime of violence. On June 22, 2010, Allen and Diggs were each sentenced to a total sentence of life imprisonment plus 90 years. Allen and Diggs subsequently appealed their convictions.

The Court of Special Appeals affirmed, holding that the DNA match evidence was properly excluded because under "the plain meaning of [PS] § 2-510, evidence of a CODIS match is not admissible *at trial*—any trial, not just the trial of the individual associated with the DNA record—unless additional testing confirms the match." *Diggs & Allen v. State*, 213 Md. App. 28, 56, 73 A.3d 306, 322 (2013) (emphasis in original). The court stated further that "an identification based solely on CODIS 'matches' is precisely the type of evidence PS § 2-510 is intended to and does, in fact, prohibit." 213 Md. App. at 59, 73 A.3d at 324. We granted Allen's and Diggs's petitioner for certiorari to answer the following question, which we have consolidated and rephrased for clarity:

Does PS § 2-510 prohibit the introduction at trial by a criminal defendant of evidence of DNA matches to alternative suspects; and if so, does § 2-510 deny

13

a criminal defendant his or her constitutional right to present a defense?

For the following reasons, we shall affirm the judgment of the intermediate appellate court.

## DISCUSSION

In its broadest sense, this case deals with the admissibility of DNA profile evidence in criminal trials. We have recognized that "DNA is a powerful evidentiary tool and its importance in the courtroom cannot be overstated." *Whack v. State*, 433 Md. 728, 732, 73 A.3d 186, 188 (2013). Moreover, DNA evidence can serve both exculpatory and inculpatory functions. This case presents the unusual scenario of a criminal defendant offering DNA evidence to prove the identity of a third party to imply a possible alternative suspect in the crime, and as exculpatory evidence at the defendant's trial.

### Background – DNA Evidence and CODIS

Before we consider the merits of this case, we shall review briefly the DNA collection and testing process to shape the context of our analysis. First, we note that under the Maryland DNA Collection Act, PS § 2-510 *et seq.*, Maryland cooperates with the FBI's CODIS program, part of which is the National DNA Index System ("NDIS"), a database that contains the DNA profiles uploaded by participating laboratories around the country.[8] For

_____

[8] *See* Federal Bureau of Investigation, *Frequently Asked Questions (FAQs) on the C O D I S   P r o g r a m   a n d   t h e   N a t i o n a l   D N A   I n d e x   S y s t e m*, http://www.fbi.gov/about-us/lab/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited November 20, 2014) ("CODIS . . . is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases. The National DNA Index System or NDIS is considered one part of CODIS, the national level, containing the DNA profiles contributed by federal, state, and local (continued...)

that reason, we shall also consult as guidance for our review the NDIS Operational

Procedures Manual ("NDIS Manual").[9]

Under the Maryland DNA Collection Act, to analyze DNA the collecting agency (*i.e.*

the state or local police) must first obtain a sample.  The Act defines a "DNA sample" as:

> [A] body fluid or tissue sample that is:
> (1) provided by an individual who is convicted of a felony or a violation of §
> 6-205 or § 6-206 of the Criminal Law Article;
> (2) provided by an individual who is charged with:
> (i) a crime of violence or an attempt to commit a crime of violence; or
> (ii) burglary or an attempt to commit burglary; or
> (3) submitted to the statewide DNA data base system for testing as part of a

---

(...continued)
participating forensic laboratories.").

In *Maryland v. King*, the United States Supreme Court described the nature and
function of CODIS:

> Authorized by Congress and supervised by the Federal Bureau of
> Investigation, the Combined DNA Index System (CODIS) connects DNA
> laboratories at the local, state, and national level. Since its authorization in
> 1994, the CODIS system has grown to include all 50 States and a number of
> federal agencies. CODIS collects DNA profiles provided by local laboratories
> taken from arrestees, convicted offenders, and forensic evidence found at
> crime scenes. To participate in CODIS, a local laboratory must sign a
> memorandum of understanding agreeing to adhere to quality standards and
> submit to audits to evaluate compliance with the federal standards for
> scientifically rigorous DNA testing. . . .  In short, CODIS sets uniform national
> standards for DNA matching and then facilitates connections between local
> law enforcement agencies who can share more specific information about
> matched . . . profiles.

133 S. Ct. 1958, 1968, 186 L. Ed. 2d 1, 18-19 (2013) (citations omitted).

[9] *See* FBI Laboratory, National DNA Index System Operational Procedures Manual
(2014), http://www.fbi.gov/about-us/lab/biometric-analysis/codis/ndis-procedures-manual.
The parties and the Court of Special Appeals also relied heavily on the NDIS Manual.

criminal investigation.

PS § 2-501(i).  As noted by the Court of Special Appeals, DNA samples may be obtained in

two primary ways: (1) directly from an individual,[10] typically by a buccal swab; or (2) from

forensic evidence collected from a crime scene.  *See Diggs & Allen*, 213 Md. App. at 50-51,

73 A.3d at 319.  Once collected, DNA samples are analyzed by a licensed facility to produce

a "DNA profile," which is defined by the NDIS Manual as "[t]he genetic constitution of an

individual at defined locations (also known as loci) in the DNA. . . ."  NDIS Manual at 82.

The laboratory then creates a "DNA record," which is defined by the Act as "DNA

information stored in CODIS or the statewide DNA data base system[, and] includes the

information commonly referred to as a DNA profile."  PS § 2-501(h).  According to the

NDIS Manual, the DNA record is "[a] database record that includes the DNA profile as well

as data required to manage and operate NDIS, i.e., the Originating Agency Identifier which

serves to identify the submitting agency; the Specimen Identification Number; and DNA

personnel associated with the DNA profile analyses."  NDIS Manual at 83.  Essentially, the

DNA record serves as the administrative envelope for the DNA profile.

   Once a DNA profile is prepared, it can be compared with profiles produced by other

---

[10] In *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004), this Court upheld the
constitutionality of the DNA Collection Act as to the collection of DNA samples from
convicted persons.  More recently, the Supreme Court of the United States upheld the
constitutionality of the collection of DNA samples from an individual taken under "arrest
supported by probable cause to hold for a serious offense[.]"  *King*, 133 S. Ct. at 1980, 186
L. Ed. 2d at 32.

16

samples, a process we have previously referred to as "DNA profiling." *See Young v. State*,

388 Md. 99, 110, 979 A.2d 44, 50 (2005) ("DNA profiling typically is used to compare a

suspect's DNA with a sample of DNA taken from a crime scene."). As relevant to our

analysis, DNA profiles are typically developed by a laboratory at the state or local level and

then uploaded to CODIS. NDIS maintains multiple searchable indices of DNA records.[11]

NDIS Manual at 41-42. The "forensic" and "offender"[12] indices are typically the most

relevant in a criminal investigation. Justice Scalia, in his dissent in *Maryland v. King*,

characterized these indices, respectively, as the "Unsolved Crimes Collection" and "Convict

and Arrestee Collection." 133 S.Ct. 1958, 1984, 186 L. Ed. 2d 1, 36.

Once a week, NDIS runs a search of all new and modified DNA records against all

records maintained in the authorized indices. NDIS Manual at 42. An "Offender Candidate

Match" occurs when a forensic DNA profile matches an offender DNA profile. *Id.* at 44.

In other words, the "unknown" DNA profile, developed by the lab from crime scene

evidence, produces a match to a DNA profile of a known individual kept on file in the NDIS

indices. Once this occurs, NDIS sends a report to the laboratories that submitted each

---

[11] The NDIS indices are authorized pursuant to the Federal DNA Act, 42 U.S.C. § 14132, and include the following categories: "forensic," "offender," "missing person," "relatives of missing person and pedigree tree," and "unidentified human (remains)." *See* NDIS Manual at 41-42.

[12] The "offender" index actually refers to multiple indices: the convicted offender index, the arrestee index, the detainee index, the legal index, and the multi-allelic offender index. NDIS Manual at 42 n.21. For clarity, we shall refer to DNA profiles filed in any of these indices as "offender" profiles.

profile: the laboratory that submitted the unknown profile developed from crime scene evidence is called the "Casework Laboratory," and the laboratory that submitted the original known profile is called the "Offender Laboratory." *Id.* at 44-45. The laboratories then complete an administrative check to make sure that there were no errors in the original records. *Id.* at 45. If this process verifies the accuracy of the records, NDIS then refers to the match as a "confirmed match." *Id.* at 46. It is only once this occurs that the Offender Laboratory releases the personal information of the known DNA sample to the Casework Laboratory for use in the criminal investigation. *Id.* As noted in the NDIS Manual, this is not the end; once there is a confirmed match, the Casework Laboratory must obtain from the relevant law enforcement agency "a legally obtained sample from the offender that documents the chain of custody[,]" so that "[t]he Casework Laboratory can then perform DNA analysis on the newly obtained known biological sample submitted by the Law Enforcement Agency." *Id.* The goal, then, is for the match to aid in the investigation and prosecution of a criminal case.[13]

---

[13] The Court of Special Appeals emphasized the difference between a DNA "match" and a DNA "hit," which appears in the record to have been used interchangeably by the parties and by Ms. Strickman. *Diggs & Allen*, 213 Md. App. at 53, 73 A.3d at 320-21. The NDIS Manual does draw a distinction between a "match" and a "hit," explaining that "[a] match occurs when CODIS makes an association between two or more DNA profiles and a confirmation process is started by designated laboratory personnel from each affected laboratory. A hit occurs when a confirmed or verified match aids an investigation and one or more of the case(s) involved in the match is unsolved." NDIS Manual at 52.

This distinction appears to be significant only for CODIS disposition and reporting requirements, *i.e.*, CODIS statistics regarding how many criminal cases are aided or solved due to a CODIS assistance. *See* NDIS Manual at 51 ("The primary metric tracked for

(continued...)

18

**Admission of DNA Match Evidence**

In the instant case, the defense sought to introduce DNA match evidence to prove the identities of Debreau and Bangora, and that DNA belonging to Debreau and Bangora was found at the scene of the crime. Then, the defense proffered that it would introduce evidence that Mr. Debreau had recently pled guilty to committing a factually similar crime in the same county. We first question the relevance of this evidence. With regard to the introduction of the identities of Debreau and Bangora, at oral argument before this Court, counsel for Diggs urged that assigning a name to the unknown DNA at trial would have a greater effect on the jury in terms of raising reasonable doubt as to the defendants' guilt. At the pre-trial hearing, defense counsel proffered that "the more Richard Debreau DNA found on the scene, the more exculpatory I suggest this may well be." Petitioners did not specify how the presence of Debreau's or Bangora's DNA at the scene would negate Petitioners' participation in the criminal enterprise, however.[14] Without some other evidence tending to connect the individuals whose DNA was found at or near the crime scene to the actual crime, or tending to negate or nullify Petitioners' own culpability, particularly where it was clear that the incident involved multiple persons, the identity of those other individuals is of very limited,

_____

(...continued)
CODIS is the number of investigations aided[.]"). In addition, no such definitions are used in the Maryland DNA Collection Act. Accordingly, this distinction has no real significance or effect on our analysis and interpretation of PS § 2-510.

[14] Indeed, at the pre-trial motions hearing, the trial judge pointed out an alternate theory, "[m]aybe they keep their clothing in the same closet."

if any, probative value.[15]

As to Mr. Debreau, however, Petitioners' proffer was twofold. Essentially, by offering evidence of the presence of Debreau's DNA at the crime scene, coupled with Debreau's recent conviction relating to an alleged similar "home invasion drug-rip style robbery" also in Montgomery County, the defense attempted to offer evidence of an alternative suspect to shift the blame away from Petitioners. At oral argument before this Court, counsel for Petitioners did not provide an answer as to specifically *how* the evidence regarding Debreau's conviction would have been admissible into evidence or, more importantly, how the underlying *facts* of that conviction would have been admissible, given that there is at present no crime titled "home invasion" in Maryland. The evidence relating to Debreau's alleged similar "home invasion drug-rip style robbery," as offered, would

---

[15] To support their claims, Petitioners point to cases from other states regarding third party culpability evidence. These cases, however, are inapposite. For example, in *State v. Cerreta*, 796 A.2d 1176 (Conn. 2002), the Supreme Court of Connecticut overturned a trial court's ruling to exclude the defense's introduction of DNA evidence resulting from hairs found at the murder scene that did not belong to the defendant. There, the Supreme Court of Connecticut explained that "a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. The defendant must, however, present evidence that directly connects a third party to the crime." *Id.* at 1183 (citations and quotations omitted). In holding that the third party evidence was relevant and exculpatory, the court noted that "[t]he hair and fingerprints were recovered not from the periphery of the crime scene but from the victim's body, the ligatures used to bind her hands and feet, and the personal effects on and around her body." *Id.* at 1184. Unlike the facts in *Cerreta*, where DNA evidence was found *on the body of the victim*, in this case, DNA evidence was found on objects located in and around the crime scene (the record in this case indicates that one bandana was found on a sidewalk outside the apartment and one was found in the apartment stairwell).

20

constitute "other crimes" or "prior bad acts" evidence.

The admission of "other crimes" evidence is governed by Md. Rule 5-404(b), which provides that:

> Evidence of other crimes, wrongs, or acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

In *Sessoms v. State*, 357 Md. 274, 744 A.2d 9 (2000), this Court held that the exclusion under Md. Rule 5-404(b) applies only to other crimes or prior bad acts of *the defendant*. In other words, the exclusion of other crimes evidence does not apply when the accused, *in his or her defense*, offers other crimes evidence of another individual.

The use of other crimes evidence by the defendant "as a shield" has been referred to as "reverse other crimes evidence." *Sessoms*, 357 Md. at 287, 744 A.2d at 16-17 (quoting *United States v. Aboumoussallem*, 726 F.2d 906, 911-12 (2d Cir. 1984)) ("[T]he standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword."); *Gray v. State*, 137 Md. App. 460, 486, 769 A.2d 192, 207 (2001) *reversed on other grounds*, 368 Md. 529, 796 A.2d 697 (2002). As stated by the Court of Special Appeals in *Gray v. State*, "the admissibility of reverse other crimes evidence, *i.e.*, evidence that someone other than the defendant committed other crimes or bad acts, is governed by Md. Rule 5-403[.]" *Gray*, 137 Md. App. at 487, 769 A.2d at 207. Maryland Rule 5-403 provides that relevant evidence "may be

21

excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Thus, reverse other crimes evidence must be relevant[16] and must pass the Md. Rule 5-403 balancing test—that is, its probative value must not be outweighed by the danger of unfair prejudice. *See United States v. Stevens*, 935 F.2d 1380, 1405 (1991) ("[A] defendant must demonstrate that the 'reverse [other crimes]' evidence has a tendency to negate his [or her] guilt, and that it passes the Rule 403 balancing test."). It appears highly likely that the admission of evidence of Debreau's DNA at the scene would have resulted in a "mini-trial," with the State using gang evidence and evidence of "robbery kits" to rebut the inference that Debreau and/or Bangora committed the robbery and assaults. To do so undoubtedly would have been misleading and confusing to the trier of fact. Moreover, as noted by the Court of Special Appeals, "[a]s a basis of its ruling, the trial court adopted the prosecutor's contention that the admission of the CODIS matches on these facts would result in a confusing and distracting mini-trial on gang-related issues. . . . This determination has not been challenged on appeal." *Diggs & Allen*, 213 Md.

---

[16] We note that for evidence in this context to be relevant, the defendant must show that "the proffered evidence exculpates the defendant or gives credence to the theory that someone else other than the defendant committed the crime." *Moore v. State*, 154 Md. App. 578, 603-04, 841 A.2d 31, 46 (2004) *aff'd but criticized*, 390 Md. 343, 889 A.2d 325 (2005) (holding that evidence of prior bad acts of a witness "did not exculpate [the defendant], but rather only made it more likely that [the witness] was [also] involved"); *Wilson v. State*, 148 Md. App. 601, 645, 814 A.2d 1, 26 (2002) (holding that similar acts evidence about a third party "d[id] not in and of itself exculpate [defendants,]" particularly because, "[g]iven the fact that the offenses were committed by multiple defendants, the question is not whether [defendants] *or* someone else committed the offenses, but rather whether [defendants] *and* someone else committed the offenses") (emphasis in original).

App. at 61-62, 73 A.3d at 325-26 (citing Md. Rule 5-403). We agree with the Court of Special Appeals. Any slight probative value here would have been outweighed by its prejudicial effect (*i.e.*, the confusion and delay caused by the "mini-trial on gang-related issues").[17]

Aside from questions of relevance, unfair prejudice, and confusion with regard to the introduction of evidence of Debreau's and Bangora's DNA, there are express statutory limitations on the admissibility of DNA profile evidence. We address these statutory limitations next.

### PS § 2-510

At issue before us is PS § 2-510, which provides that "[a] match obtained between an evidence sample and a data base entry may be used only as probable cause and is not admissible at trial unless confirmed by additional testing." In this case, it is undisputed that no "additional testing" was completed (by the State or Petitioners) regarding the DNA matches with regard to either Debreau or Bangora. The Court of Special Appeals held that under the plain meaning of the statute, the failure to perform additional confirmatory testing barred the introduction of the DNA match evidence at trial. *Diggs & Allen*, 213 Md. App. at 59, 73 A.3d at 324. We agree with the Court of Special Appeals.

Petitioners argue that the trial court and the Court of Special Appeals erred in their

---

[17] Because the evidence would have been inadmissible at trial anyway, we reject Petitioners' argument that the State "sandbagged" the defense by waiting until the conclusion of its case to object to the introduction of this evidence.

23

interpretation of this section to exclude the Petitioners' use of DNA matches to third parties. Petitioners assert that PS § 2-510 was only intended to apply to the admission of evidence *against the accused*, who is also the *subject* of the match. Petitioners would have us draw a distinction between the State's inculpatory use of DNA match evidence and a criminal defendant's exculpatory use of that same evidence, based on the nature of the statute and a criminal defendant's constitutional right to present a fair defense at trial.

The State responds that the Court of Special Appeals correctly interpreted PS § 2-510 to prevent the admission of the DNA match evidence. According to the State, the statute is plain and unambiguous in that PS § 2-510 is not limited to evidence introduced by the State, and that it requires every "match" to be "confirmed by additional testing" before it is admissible at trial. Moreover, the State asserts, the Court of Special Appeals's interpretation is consistent with the intent of the legislature because a requirement for additional confirmatory testing ensures the reliability of the evidence offered at trial.

We review the Court of Special Appeals's interpretation of the statute *de novo*. *Allen v. State*, 402 Md. 59, 71, 935 A.2d 421, 427-28 (2007). The canons of statutory interpretation are well established. "The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the legislature beginning with the plain language of the statute, and ordinary, popular understanding of the English language." *Hammonds v. State*, 436 Md. 22, 40, 80 A.3d 698, 709 (2013) (citations and quotations omitted). At the same time, we "do not read statutory language in a vacuum, . . . [r]ather, the plain language must

24

be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Gardner v. State*, 420 Md. 1, 9, 20 A.3d 801, 806 (2011) (quoting *State v. Johnson*, 415 Md. 413, 421-22, 2 A.3d 368, 373 (2010)).

Before we begin our analysis, we note that PS § 2-510 has gone through several amendments since its enactment in 1994. As originally enacted, this section read: "[a]ny match obtained between an evidence sample and a data base entry may only be used as probable cause to obtain a blood sample from the subject and is not admissible at trial unless confirmed by additional testing." Md. Code 1957 (1994 Cum. Supp.), art. 88B, § 12A(l); 1994 Md. Laws, ch. 458. An amendment in 2003 substituted the phrase "an additional DNA sample" for "a blood sample," presumably reflecting the legislature's recognition that a DNA sample can come from something other than blood. Therefore, after 2003, the statute read: "[a] match obtained between an evidence sample and a data base entry may only be used as probable cause to obtain an additional DNA sample from the subject and is not admissible at trial unless confirmed by additional testing." PS § 2-510 (2003); 2003 Md. Laws, ch. 240. It was next amended in 2005 to read: "[a] match obtained between an evidence sample and a data base entry may only be used as probable cause and is not admissible at trial unless confirmed by additional testing." PS § 2-510 (2003, 2005 Cum. Supp.); 2005 Md. Laws, ch. 245. This amendment followed an advisory opinion from the Office of the Attorney General in 2004, discussed in more detail *infra*, opining that a DNA match could also be used as

25

probable cause to charge and arrest an individual. 89 Op. Att'y Gen. 189. Thus, the 2005 amendment made clear the General Assembly's intention that a data base match may be used as probable cause for purposes other than simply obtaining another sample. The legislature tweaked the statute again in 2012 (after trial in the instant case) apparently for stylistic reasons. *See* PS § 2-510 (2003, 2011 Repl. Vol., 2012 Supp.); 2012 Md. Laws, ch. 66 (moving "only" to a more grammatically appropriate position within the sentence, such that the statute now reads: "[a] match obtained between an evidence sample and a data base entry may be used only as probable cause and is not admissible at trial unless confirmed by additional testing"). Despite the numerous changes, the legislative history of PS § 2-510 is rather unenlightening as to the purpose and intent of the "additional testing" requirement. Nevertheless, it is notable that the legislature has at no time altered the "additional testing" language.

As it read at the time of trial in this case, PS § 2-510 (2003) provided that "[a] match obtained between an evidence sample and a data base entry may only be used as probable cause and is not admissible at trial unless confirmed by additional testing." Before we get to the application of this rule, we note that this section of the Act is rife with undefined terms. First, the Act does not provide a definition for "match." Second, the legislature did not modify the phrase "at trial." At issue in this case is the question: whose trial? Does it apply to *any* trial? The Court of Special Appeals thought so. Third, the Act does not provide any express definition for "additional testing."

26

In the context of DNA analysis, we can be confident that the term "match" generally refers to two DNA samples (namely, one sample taken from the crime scene and one already entered into the data base, or taken directly from the defendant or suspect) that are sufficiently alike as to resemble one another. *See Webster's II New College Dictionary* 690 (3d ed. 2005) (defining "match" as "[o]ne exactly like another[;] . . . [o]ne like another in one or more specified qualities[;] . . . [o]ne that closely harmonizes with or resembles another."). Judge Raker, writing for the Court in *Young v. State*, 388 Md. 99, 979 A.2d 44 (2005), explained that a DNA "match" occurs when "the suspect's DNA sample has matched the crime scene DNA sample at a certain number of critical alleles." 388 Md. at 111, 879 A.2d at 51. By way of example, the "supplemental report" in the instant case, alerting the Montgomery County police to the match to Debreau, stated that the "DNA profile obtained from [the black bandana]" was "consistent with the DNA profile of Richard Debreau."

In *Young*, we cautioned that "when a DNA 'match' has been declared, a conclusive identification of a crime suspect as the source of the unknown DNA sample is not being made." *Id.* Rather, the Court continued:

> Once a DNA match determination has been made, forensic scientists perform statistical analysis of population frequencies to estimate the statistical significance of the match, by calculating the likelihood that a random person (*i.e.*, not the person whose DNA actually was left at the crime scene) would match the crime scene sample, commonly referred to as the 'random match probability.'

*Id.* Is this statistical analysis part of the "additional testing" to which the legislature referred in PS § 2-510? The State contends that it is. Although it may be a question more for the

27

scientists than for the courts, particularly because DNA analysis involves rapidly evolving technology, we nevertheless address the definition of "additional testing" as it relates to the parties' claims in this case.

Petitioners argue that the "confirmation process" performed by the NDIS in sending reports to the Casework and Offender Laboratories to complete an administrative check satisfies the confirmation requirement of PS § 2-510.[18] The State disagrees, arguing that the "CODIS confirmation process" relied on by Petitioners is no more than a "quality control exercise." The State asserts that "additional testing" relates to when the Casework Laboratory seeks a "legally obtained sample from the offender that documents the chain of custody[,]" NDIS Manual at 46, and then performs DNA analysis on the newly obtained known sample to compare it to the evidence sample from the crime scene, which would include the statistical analysis described in *Young*. Moreover, the State points out, to agree with Petitioners that the CODIS confirmation process satisfies the confirmation requirement would render the statute meaningless because every match would be a confirmed match. We agree with the State.

---

[18] In addition, Petitioners assert that because the lab report of the match states that the DNA analysis is "validated according to the standards issued by the Director of the Federal Bureau of Investigation," the match meets the requirements for admissibility under CJP § 10-915, discussed in more detail *infra*, and, therefore, the testing was sufficient to confirm the match and no additional testing was required. This argument fails for two reasons. First, the language relating to validation by FBI standards is part of the definition of "DNA profile," not a separate admissibility requirement. Second, even if the DNA match was performed pursuant to FBI standards, the express language of PS § 2-510 requires something more: once the match is determined, it must be confirmed by additional testing.

Common sense tells us that "additional testing" must mean something extra, in addition to the original test or analysis that resulted in a "match" in the first instance, and that additional testing is more than statistical analysis. Moreover, our rules of statutory construction require us to interpret the statute such that "no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Blake v. State*, 395 Md. 213, 224, 909 A.2d 1020, 1026 (2006). It seems clear that the "additional testing" must at least include the statistical analysis described in *Young*. The facts of this case indicate as much: first, the laboratory report regarding the match states, under the heading "disposition of evidence/remarks," that "[s]tatistical calculations and DNA comparisons to the DNA profiles previously obtained can be conducted upon request." Second, and more importantly, Ms. Strickman specifically testified that no additional confirmatory testing was done on the DNA matches in this case, and then described what she meant by "additional testing" by explaining that the report of the match would need to be "further investigated to determine if there is a connection to this individual, and if then they would need the comparison done with the individual's profile to the evidence profile." From this testimony, we gather that the laboratory has a protocol by which it gathers a DNA sample from the suspect and conducts "a direct comparison" to confirm any DNA match, which is plainly required before the evidence will be admissible at trial.

Next, we look to the use of the phrase "at trial." On its face, the statute creates a bright line limitation on the introduction of DNA match evidence. Nothing in its language

29

serves to restrict the applicability of this limitation to certain trials or to certain proponents of the evidence. Petitioners point to the original predecessor language of the statute, providing that the "match . . . may only be used as probable cause to obtain a blood sample *from the subject* and is not admissible at trial unless confirmed by additional testing[,]" (emphasis added) to argue that "[i]t would be odd indeed to read the first part of this sentence to apply to a specific person, *i.e.*, the subject, but read the second part as applying to anyone in any trial." We disagree. To accept Petitioners' view, that the prohibition only applies to evidence related to the accused at the trial of the accused, would require us to add words to the language of the statute. "[W]e will not read into the statute words that give it an interpretation that limits or extends its application beyond the words the Legislature used." *Harford Cnty. v. Saks*, 399 Md. 73, 86, 923 A.2d 1, 9 (2007). Petitioners counter that such an interpretation of the statute does precisely what we have sworn not to do: add the word "any" before "trial" (*i.e.*, ". . . not admissible at *any* trial). Again, we disagree. By stating "at trial" without any modifiers, the legislature left the prohibition open-ended. In any event, we conclude that, had the legislature intended the rule to apply only to a DNA match *to the accused* at the trial *of the accused*, it could easily have said so. Therefore, we conclude that "at trial" refers to the trial at which the evidence is being offered—whether the evidence is a match to the defendant in that particular case or to a third party.

Notwithstanding our plain reading of the text of the statute, we do not read it "in a vacuum" and, instead, also look to the statutory scheme in which it is found. As described

30

by this Court in *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004), the Maryland DNA Collection Act, PS § 2-501 *et. seq*, directs the "creation of a statewide regulatory DNA data base system," outlines specific "procedures for the collection of DNA samples[,]" and provides "several protections to the individuals whose DNA is collected and stored[.]" 383 Md. at 9-11, 857 A.2d at 23-25. Petitioners argue that this "regulatory scheme" is devised with the intent of creating restrictions on what *the State* can and cannot do with regards to DNA evidence, and therefore only applies to State action. We conclude that the plain meaning of the statute forecloses this argument, and, moreover, the purpose of requiring additional testing demonstrates the importance the legislature placed on the *reliability* of the evidence. In our view, the reliability of a DNA match is important whether the match relates to the accused or to some third party.

In addition, Petitioners rely on an advisory opinion by the Attorney General's Office (OAG) to show that PS § 2-510 only applies when the individual on trial is also the subject of the match. Specifically, Petitioners point to the OAG's conclusion that "[t]he data base match would be inadmissible at a *trial of that individual*, unless the sample obtained pursuant to the search also matches the crime scene DNA." 89 Op. Att'y Gen. 189, 194 (2004) (emphasis added). In addition, the opinion states that "[t]he essence of PS § 2-510 is that an individual may not be *convicted* on the basis of a match, but that the match may be used for further investigation that may well lead to conclusive evidence of the individual's involvement in the crime." *Id.* at 192. Accordingly, Petitioners contend, the statute does not

31

provide a limitation when the *accused* attempts to admit DNA evidence related to another individual as part of the defense.

The focus of the OAG opinion, however, did not relate to admitting evidence of a DNA match at trial. Rather, the purpose of the opinion was to offer guidance as to whether, under the statute as it read at that time, a DNA match could be used as probable cause to make an arrest. The opinion offers no direct advice regarding the use of DNA match evidence at trial; nevertheless, some of the explanations regarding PS § 2-510 are instructive. For instance, the opinion begins its analysis by stating that:

> PS § 2-510 is clear in two respects: (1) a match between an evidence sample of DNA and a data base entry is not by itself admissible at trial, and (2) the match may be used as probable cause to obtain a blood sample or other DNA sample from the individual identified with the data base entry to confirm the match.

*Id.* at 191. The OAG then further opines that the placement of the word "only" was intended to emphasize the restriction "that the data base match by itself is inadmissible at trial." *Id.* at 193. Thus, the opinion continues, "[a] DNA data base match is analogous to hearsay or other types of evidence that the Legislature or courts have determined to be inadmissible at trial for a variety of reasons[.]" *Id.* Accordingly, the OAG opinion is in line with our own in this case: the legislature specifically intended that any DNA data base match is inadmissible unless confirmed by additional testing. This conclusion is not contradicted by the use of the phrase "trial of that individual" in the OAG's conclusion when viewed in context. The conclusion reads:

32

> In our opinion, a data base match may be used to establish probable cause to charge and arrest *an individual*, as well as to obtain a DNA sample from *that individual*. The data base match would be inadmissible at a trial of *that individual*, unless the sample obtained pursuant to the search also matches the crime scene DNA.

*Id.* at 194. (emphasis added). When viewed in context, then, the use of the phrase "that individual" was an exercise in parallel structure, and does not speak to any purported conclusion that the rule would only apply in certain circumstances. We also note that the OAG explains that the purpose behind the question posed to it is to use the match as probable cause to "arrest and [detain] a suspect *while the test to confirm the match* is being conducted." *Id.* at 191 (emphasis added). Thus, we find in the OAG's opinion further support for our earlier conclusion that there is some test or protocol in place to conduct additional confirmatory testing of a DNA match—which would yield potentially admissible evidence at trial. Although the legislative history related to this particular section is "unenlightening," as noted by the OAG opinion, we agree with the State and the Court of Special Appeals that common sense indicates that the legislature was concerned about the reliability of DNA match evidence, especially where there is the potential for a match involving an old DNA profile stored in the data base for some time.

PS § 2-510 is not the only statute relating to the admissibility of DNA evidence, however. There is a statute directly on point in Title 10 ("Evidence") of the Maryland Code (1973, 2013 Repl. Vol., 2014 Supp.), Courts and Judicial Proceedings Article ("CJP"). CJP § 10-915 governs the "[a]dmissibility of DNA profiles." Subsection (c) states that "[i]n any

33

criminal proceeding, the evidence of a DNA profile is admissible to prove or disprove the identity of any person," so long as the party complies with a list of notice requirements. CJP § 10-915(c). This Court has held that "under [CJP 10-915], the Maryland Legislature has identified the results of DNA tests, or in other words, the production of DNA profiles, . . . to be generally 'reliable and admissible.'" *Cooper v. State*, 434 Md. 209, 230-31, 73 A.3d 1108, 1120-21 (2013) (quoting *Armstead v. State,* 342 Md. 38, 54, 673 A.2d 221, 229 (1996)). Petitioners argue that CJP § 10-915(c), providing that "[i]n any criminal proceeding, the evidence of a DNA profile is admissible to prove or disprove the identity of any person . . . [,]" suggests a blanket grant of admissibility because it applies to "*any* criminal proceeding" and "*any* person." To interpret the statute that way, however, would be to read CJP § 10-915 to the exclusion of the express language of PS § 2-510. Despite the fact that PS § 2-510 is not included in Title 10 ("Evidence") of the Courts and Judicial Proceedings Article, it serves as a specialized rule of evidence pertaining to DNA matches.

In addition to CJP § 10-915, Petitioners point us to PS § 2-508, which expressly provides for defense access to DNA evidence relevant to the case against the defendant. PS § 2-508(b) ("Availability to defendant") provides, in relevant part:

> (1) The typing results and personal identification information of the DNA profile of an individual in the statewide DNA data base system shall be made available to a defendant or defendant's counsel on written order of the court in which the case is pending.
> (2) A search of the data base to determine the existence of a match to DNA obtained from crime scene evidence taken in relation to the crime for which a defendant is charged shall be conducted if:
> (i) the defendant requests the search; and

34

(ii) a court issues a written order for the search.
(3) This subtitle does not limit a court from ordering discovery of a DNA record or other related material in a criminal case.

Petitioners contend that to interpret PS § 2-510 to exclude the defense's introduction of DNA match evidence at trial would be inconsistent with PS § 2-508(b)'s rule providing for defense access to that very information. As noted by the State, however, the purpose of PS § 2-508 is to *develop* evidence—the fact that the defendant can obtain evidence does not mean that it is automatically admissible at trial. *See Falik v. Hornage*, 413 Md. 163, 190 n.11, 991 A.2d 1234, 1250 n.11 (2010) ("We note that simply because the material is discoverable, that does not mean that the evidence will necessarily be admissible at trial. The evidence will be admissible only upon a showing by the proponent that it is relevant."). In addition, this section provides a basis for the defendant to research the match and then to procure the "additional testing" that is required for admissibility at trial. Furthermore, the discovery rules permit a defendant to request the court to order additional testing of DNA evidence. *See* Md. Rule 4-264 (permitting the circuit court, on motion of any party, to issue a subpoena for "tangible things, not privileged, which may constitute or contain evidence relevant to the action"). Indeed, the record in this case supports the conclusion that Petitioners could have but did not obtain the required additional testing.

To conclude, we agree with the Court of Special Appeals that PS § 2-510 "ensures that, before evidence of the 'match' is admitted at trial, two DNA samples—one from the alleged perpetrator and one from the crime scene—have been tested, analyzed, and compared

35

using the most recent scientific and technological methodologies available." *Diggs & Allen*, 213 Md. App. at 56-57, 73 A.3d at 322-23. Accordingly, the statute requires that once a match is determined, a sample from the individual identified in the DNA data base must be obtained and analyzed to compare it to the sample obtained from the crime scene. Those samples were available in this case. Montgomery County had in its possession a sample of Debreau's DNA, and the Maryland State Police had in its possession a sample of Bangora's DNA. Moreover, in a case where the defendant seeks to introduce evidence of a DNA match of some other individual, the burden is on the defendant to obtain confirmation by additional testing when the State has not performed the additional testing. Petitioners in this case failed to obtain this additional confirmatory testing, absent the apparent inability to do so, and therefore the DNA match evidence was inadmissible at trial for that reason.

**Sixth Amendment**

Petitioners assert that the interpretation of PS § 2-510 applied by the Court of Special Appeals, and as adopted now by this Court, is in conflict with Petitioners' constitutional rights to present a fair defense at trial. *See Foster v. State*, 297 Md. 191, 203, 464 A.2d 986, 993 (1983) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294-95, 93 S. Ct. 1038, 1045, 35 L. Ed. 2d 297, 308 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."). We disagree. "The right of compulsory process, under both the Federal and State Constitutions, though fundamental, is not absolute. It does not, for example, confer a right to present

36

inadmissible evidence . . . ." *Kelly v. State*, 392 Md. 511, 537, 898 A.2d 419, 434 (2006) (quoting *Wilson v. State*, 345 Md. 437, 448, 693 A.2d 344, 349 (1997)). PS § 2-510 imposes a reasonable restriction on the admission of DNA evidence, because it ensures the reliability of that evidence. More importantly, it does not preclude a defendant from admitting DNA evidence. As we have made clear, the discovery rules provide for the ability of a defendant to have the additional testing done through a court order. Indeed, the DNA specialist in this case testified that the confirmatory testing could have been completed had the proper request been made. Therefore, the exclusion of the evidence pursuant to PS § 2-510 does not infringe upon Petitioners' constitutional right to present a fair defense.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**