REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 199

September Term, 2014

GEORGE E. PICKETT, III

v.

STATE OF MARYLAND

Wright,
Graeff,
Nazarian,

JJ.

Opinion by Graeff, J.

Filed: April 3, 2015

Following a jury trial in the Circuit Court for Montgomery County, appellant, George Pickett, III, was convicted of robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, first degree assault, conspiracy to commit first degree assault, use of a firearm in the commission of a crime of violence, and conspiracy to use a firearm in the commission of a crime of violence. The court sentenced appellant to 20 years, all but seven years suspended, followed by five years of supervised probation.[1]

On appeal, appellant presents four questions for our review, which we have rephrased, as follows:

1.  Did the circuit court abuse its discretion when it allowed the State, in closing arguments: (a) to reference appellant's changed appearance; and (b) to rebut appellant's argument that the State could have performed forensic tests on the victim's iPhone case?

2.  Did the circuit court commit plain error in giving the jury an instruction on eyewitness identification?

3.  Did the circuit court commit plain error in admitting photographs from a surveillance camera?

4.  Did the circuit court err in excluding evidence that a "Find My iPhone" app on the victim's cell phone located the stolen phone at a residence other than appellant's?

---

[1] The circuit court sentenced appellant as follows: on Count I, robbery with a dangerous weapon, 10 years, all suspended; on Count II, conspiracy to commit robbery with a dangerous weapon, 10 years, all but two years suspended, to be served consecutive to the sentence on Count V; on Count III, first degree assault, 10 years, all suspended; on Count IV, conspiracy to commit first degree assault, merged with Count III for sentencing purposes; on Count V, use of a firearm in the commission of a crime of violence, 10 years, all but five years suspended, without the possibility of parole, to be followed by five years of supervised probation; and on Count VI, conspiracy to use a firearm in the commission of a crime of violence, merged with Count V for sentencing purposes.

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

The charges against appellant arose out of the robbery and assault of Samer El-Amine in Silver Spring, Maryland on February 10, 2013. Mr. El-Amine, who was 16 years old at the time of the assault, testified that at approximately 1:30 a.m., he left his friend's house and began walking home. He stopped at a 7-Eleven convenience store to purchase gummy worms. In the parking lot, approximately 20 - 30 feet away, he noticed a light brown car with two people inside. Although Mr. El-Amine could not "really see" the faces of the two individuals in the car, he did notice that the individual in the front passenger seat had a "high-top fade" haircut.[2]

Twenty to thirty seconds after Mr. El-Amine left the 7-Eleven store, "the same car . . . or I think it was the same car – it looked like it," pulled up next to him and "the person in the passenger side got out." He described the car as "the same color and the same shape." The two individuals in the car were wearing ski masks, so Mr. El-Amine could not see their faces or their hair. The person who got out of the car put a small, black gun to Mr. El-Amine's head and said: "Give me your shit."[3] The person then reached into Mr. El-Amine's pocket and removed his iPhone5, which was covered by a blue "OtterBox" phone case. The person

_____

[2] A high-top fade is defined as "[s]haved on the bottom then fad[ing] to long hair that goes inches above the head." *High-Top Fade*, Urban Dictionary, http://perma.cc/BH6R-NA7F (last visited Mar. 9, 2015).

[3] Mr. El-Amine did not remember a lot, but he thought the person who got out of the passenger side of the car "was wearing black and was a bit shorter" than he was.

also told him: "Give me this Helly, too," referring to Mr. El-Amine's red and white Helly Hansen brand jacket. Mr. El-Amine hesitated, at which point he was forced to the ground. The person removed his jacket, got back into the car, and the driver of the car drove away "very fast."

Mr. El-Amine walked to his mother's house, approximately two minutes away. He told his mother what had happened, and she called the police. In the 911 call, Mr. El-Amine described the person who got out of the car as "wearing a colorful jacket. He was kind of dark-skinned or brown-skinned, probably brown-skinned, and he had a long . . . high-top fade."[4]

When the police arrived at his mother's house that night, Mr. El-Amine gave a description of the passenger and drew a picture of the haircut that he saw on the passenger of the car when he walked out of the 7-Eleven. A few days later, Mr. El-Amine went to the police station to look at photographs of potential suspects. He identified a photograph of an individual that he thought "was him, but [he] wasn't sure." He explained that he chose the photograph based on the skin tone of the individual depicted, noting that, during the robbery, he was able to see the individual's "eyes and the skin around his eyes and part of the nose."

---

[4] On cross-examination, Mr. El-Amine testified that he did not recall telling the police who responded to the 911 call that the individual who had robbed him had been wearing a colorful jacket, but he stated that he "obviously did because of the 911 call." He agreed that, at the time of trial, he did not have any memory of what the robber wore "[b]esides a ski mask."

-3-

Detective Adam Hart, a member of the Montgomery County Police Department, testified that, on February 15, 2013, he executed two search warrants, one at 816 Easley Street and the other at 632 Potomac Avenue. When he executed the Easley Street warrant, there were four individuals inside: appellant, Dayquan Tyler, Michael Tyler, and Diante Tyler.[5] Detective Hart identified a photograph of appellant taken that day, at the time of appellant's arrest. The photograph was admitted into evidence as State's Exhibit 7, and it depicted appellant with a high-top fade haircut.

When Detective Hart executed the warrant at 816 Easley Street, Dayquan was sleeping on the floor in the living room, and appellant was sleeping on a bed in the master bedroom. Detective Hart found appellant's birth certificate and social security card at the residence. In the middle of the living room, there was a ladder with a red and white Helly Hansen ski jacket on top of it.

Detective Hart then executed the warrant at 632 Potomac Avenue. In the bedroom basement of that residence, behind a locked door to which he had retrieved the keys from Dayquan's pocket during the search at 816 Easley Street, Detective Hart found a birth certificate and social security application for Dayquan Tyler. He also found a blue "OtterBox" case for an iPhone5. A functional firearm was recovered from a dog house

_____

[5] To avoid confusion, we will refer to these individuals by their first names. The spelling of "Dayquan" is inconsistent in the transcript and the parties' briefs. We use "Dayquan."

behind Dayquan's residence. The mixture of DNA recovered from the firearm was not suitable for comparison.

Detective Jesse Dickensheets, a member of the Montgomery County Police Department, testified that, on February 13, 2013, three days after the robbery, he saw appellant walk out of 816 Easley Street wearing a red and white Helly Hansen jacket. Detective Dickensheets identified a photograph of the jacket and identified appellant in court as the individual who had been wearing the jacket.

At trial, Mr. El-Amine identified the OtterBox and the jacket that had been stolen from him. His iPhone5 was not recovered.

## DISCUSSION

## I.

### Closing Argument

Appellant's first argument is that the court "erred in permitting the State's improper argument about facts not in the record." Specifically, he contends that the court should not have permitted the State to: (1) point out that appellant had changed his hairstyle between the time of his arrest and the trial; and (2) insinuate that appellant's DNA and fingerprints were found on the OtterBox iPhone case recovered from Dayquan's residence.

The State disagrees. It contends that the court properly exercised its discretion in controlling closing argument, asserting that: (1) the comments regarding appellant's hair

were "appropriate and relevant" where identity was an issue, and (2) appellant mischaracterizes the argument regarding the OtterBox.

## A.

### Standard of Review

It is well established that "attorneys are afforded great leeway in presenting closing arguments to the jury." *Degren v. State*, 352 Md. 400, 429 (1999). *Accord Sivells v. State*, 196 Md. App. 254, 270 (2010), *cert. dis'd as improv. granted*, 421 Md. 659 (2011). The Court of Appeals defined the boundaries of permissible summation in *Wilhelm v. State*, 272 Md. 404 (1974), as follows:

> As to summation, it is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. Moreover, if counsel does not make any statement of fact not fairly deducible from the evidence[,] his argument is not improper, although the inferences discussed are illogical and erroneous. Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the (prosecution) produces. . . .

> While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined - no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the

facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

*Id*. at 412-13.

Nevertheless, there are limitations upon the scope of a proper closing argument. The Court of Appeals has emphasized that "counsel should not be permitted by the court, over proper objection, to state and comment upon facts not in evidence or to state what he could have proven. Persistence in such course of conduct may furnish good grounds for a new trial." *Id*. at 413. *Accord Lee v. State*, 405 Md. 148, 166 (2008) (improper to make comments "that invite the jury to draw inferences from information that was not admitted at trial"). Reversal is required, however, only "'where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused.'" *Spain v. State*, 386 Md. 145, 158 (2005) (quoting *Degren*, 352 Md. at 431).

The determination and scope of closing argument is within the sound discretion of the trial court. *Wise v. State*, 132 Md. App. 127, 142, *cert. denied*, 360 Md. 276 (2000). An appellate court should not "interfere with that judgment unless there has been an *abuse of discretion* by the trial judge of a character likely to have injured the complaining party.'" *Washington v. State*, 180 Md. App. 458, 473 (2008) (quoting *Wilhelm*, 272 Md. at 413). "'Abuse of discretion' . . . has been said to occur 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any

guiding rules or principles.'" *Nash v. State*, 439 Md. 53, 67 (quoting *North v. North*, 102 Md. App. 1, 13 (1994)), *cert. denied*, 135 S. Ct. 284 (2014).

With these principles in mind, we address appellant's contentions.

**B.**

**Appellant's Changed Appearance**

At the close of the evidence, the court and counsel discussed jury instructions. The court declined to give an instruction on consciousness of guilt, despite the State's argument that appellant's change in hairstyle could be construed as such. The court stated that "cutting your hair, alone" was not enough to warrant that instruction. It stated, however, that the State could address that issue in closing, stating: "I think that the Defense is certainly free to argue that he cut his hair. From February – it's now December. I think both of you have that argument."

During the State's closing arguments, the following occurred:

[PROSECUTOR]:  Now, what did George Pickett look like on February 15? Here we go.[6]  What does George Pickett look like today? Do you think that was an accident that Mr. Pickett cut his hair? Black –

[DEFENSE COUNSEL]: objection.

[THE COURT]: overruled.

---

[6] The prosecutor's comments suggest that she was showing the jury the photographs of appellant that had been introduced into evidence and depicted appellant with a high-top fade hairstyle.

[PROSECUTOR]: – male, shorter than the victim, dark skin, high top fade. That's what George Pickett looked like on the night that he robbed Mr. El-Amine, but he is smarter than to look like that today.

Defense counsel, in his closing argument, challenged Mr. El-Amine's identification of appellant, noting that when Mr. El-Amine identified appellant's photograph, he did not say: "'That's the guy. I'm 100 percent certain that's the guy. He doesn't say that. He says: 'I think so.' And on the witness stand he said, 'Yeah, I'm not really sure.'" Counsel continued:

> But you know what the most telling thing . . . is? He's in the same courtroom – I was going to say – maybe is that 20 feet away? Maybe. Was he asked yesterday in court, "Do you see the person who robbed you?" He wasn't even asked that. You know why? Because he couldn't say yes. He couldn't say yes. He doesn't know. That's the truth. He doesn't know who did this robbery. What he has done is he has assumed that the people in the parking lot of the 7/11 that that's the same people. That's what he's done. He's made an assumption. You can't do that. You can't assume that.

In rebuttal, the State responded:

> You heard that there is no difference between direct evidence which would be [Mr. El-Amine] standing over there saying it's him. He's drastically changed his appearance ladies and gentleman, drastically.

The court overruled appellant's objection, and the State continued:

> He identified him three days after the crime occurred. Three days. And that same day he's wearing [Mr. El-Amine's] property and his co-conspirator is found to be in possession of further property and the weapon. He saw him in the 7/11 parking lot and with no equivocation he knew it was the exact same person. And that was something [appellant's counsel] did not focus on. She focused on the actual 30 seconds of the robbery. I'm asking you to focus on all of it together. Not to exclude what he says he saw at the 7/11. Because when he calls 911, what does he say? It's the guy with the high top fade. He did not see that high top fade in the actual 30 seconds of the robbery. He made

that identification based on knowing that it was the same two men in the exact same car that followed him.

Appellant contends that the State's references in closing arguments to his changed hairstyle between the time of assault and the time of trial were improper for two reasons: (1) the State could not rely on appellant's appearance because he did not testify, and therefore, there was no evidence to establish what appellant's hairstyle looked like at trial; and (2) the evidence was not relevant because "post-apprehension changes in appearance do not constitute proper consciousness-of-guilt evidence."

The State contends that where, as here, identity was at issue, it "was appropriate for the prosecutor to emphasize to the jury that [appellant] looked different at trial than he did on the day of the crime." That argument, it asserts, accomplished three legitimate purposes: (1) it reminded the jury that appellant looked different in court from how he looked on the day of the crime; (2) it explained why Mr. El-Amine may not have been able to make an in-court identification; and (3) it appropriately suggested consciousness of guilt.

In any event, the State argues, even if there was error, it was harmless. The jury had the opportunity to observe appellant's hairstyle; thus, the jury "could make its own decision about whether [he] had the same or a different hairstyle from the man whom [Mr.] El-Amine described as his assailant, the man in the still photographs taken shortly before the crime and the man in the photo array." And the court specifically instructed the jury that it must base its decision on evidence, and that closing arguments are not evidence, but are only intended to help the jury understand the evidence and apply the law.

We begin our analysis with *Bryant v. State*, 129 Md. App. 150 (1999), *cert. denied*, 358 Md. 164 (2000), upon which appellant relies. In that case, the prosecutor commented in closing argument on the defendant's demeanor during trial, asking the jury if it noticed the failure of the defendant to look a witness in the eye. This Court held that the argument was improper, stating that prosecutorial comment "on the passive courtroom demeanor of a non-testifying defendant" was not appropriate. *Id.* at 161. We further stated that the prosecutor compounded the impropriety by adding her personal assurance that the alleged conduct occurred, saying: "We all saw it." *Id.* at 161. The Court stated: "'Generally, it has been held improper to remark on the personal appearance of an accused, except where identity is in issue or where the remark is with respect to the accused's appearance while testifying.'" *Id.* at 159 (quoting *Campbell v. State*, 65 Md. App. 498, 505 (1985)).

This case is distinguishable from *Bryant*. Unlike in that case, the prosecutor here was not commenting on appellant's demeanor or off-the-witness-stand courtroom conduct. Rather, the comments focused on appellant's hairstyle, an objective fact that the jury could see. There is a significant difference between comment on passive courtroom demeanor and comment on an undisputed, and significant, change in physical appearance. *See Diggs & Allen v. State*, 213 Md. App. 28, 81 (2013) (where prosecutor "simply asked the jury to compare an aspect of the physical appearance and mannerisms of the man in the video, who is clearly visible on screen, to the physical appearance and mannerisms of Diggs, who sat in

the courtroom before the jury" argument was not improper), *aff'd on other grounds sub nom.*, 440 Md. 643 (2014).

Other courts have addressed whether it is appropriate for a prosecutor to comment on a defendant's change in appearance between the time of the crime and the time of trial. Such a comment has been held to be appropriate where, as here, identity is at issue. *See Commonwealth v. Horwat*, 515 A.2d 514, 516 (Pa. 1986) (appropriate for prosecutor to comment on change in appearance where change may affect ability of witness to identify the defendant); *People v. Sanders*, 622 N.Y.S. 2d 986, 987 (N.Y. App. Div. 1995) ("[I]dentification of the defendant was a relevant factor in this trial, the prosecutor's reference during summation to the defendant's changed hair style, as evidenced by a photograph of the defendant at the time of his arrest, was fair comment upon the 'four corners of the evidence.'").

Moreover, where there is an undisputed significant change in appearance, other courts have held that it is not an abuse of discretion for the trial court to permit the prosecutor to argue that the change permits an inference of the defendant's consciousness of guilt. *See United States v. Foppe*, 993 F.2d 1444, 1450 (9th Cir.) (no error for prosecutor to argue that Foppe grew beard to disguise himself and prevent the eyewitness and the jury from identifying him as the robber), *cert. denied*, 510 U.S. 1017 (1993); *United States v. Jackson*, 476 F.2d 249, 251-53 (7th Cir. 1973) (prosecutor may comment on a marked change in defendant's physical appearance, i.e., cropping Afro haircut short, shaving mustache and

growing a goatee, as some evidence of guilt); *People v. Cunningham*, 25 P.3d 519, 568 (Cal. 2001) (comment on defendant's change of appearance between crime and trial not improper because it relates to identity and consciousness of guilt), *cert. denied*, 534 U.S. 1141 (2002). *See also Commonwealth v. Brown*, 676 A.2d 1178, 1183 (Pa.) (court properly admitted evidence that appellant grew a beard shortly after his arrest because "[a] jury may infer consciousness of guilt upon finding that a defendant intentionally altered his physical appearance for the purpose of avoiding identification"), *cert. denied*, 519 U.S. 1043 (1996).

We agree with this analysis. Accordingly, we hold that it is not an abuse of discretion for a trial court to allow a prosecutor to comment on a significant change in the physical appearance of the defendant between the time of the crime and the trial where the change relates to identity and consciousness of guilt. Here, identity was the primary issue, and the trial court did not abuse its discretion in permitting the prosecutor to argue that appellant's change in hairstyle was made to avoid identification.

## C.

### Lack of Forensic Testing on OtterBox Case

Appellant's next complaint about the prosecutor's closing argument is that the court erred in allowing the prosecutor, in rebuttal closing argument, to insinuate that appellant's DNA and fingerprints were found on the OtterBox iPhone case, even though it "presented absolutely no forensic evidence, whatsoever." The State contends that appellant mischaracterizes the prosecutor's argument.

In closing argument, appellant's counsel criticized the State for not examining the

iPhone case, the blue Otterbox, for fingerprints and DNA.  Counsel stated as follows:

> What else could the State have done?  What else could they have given to the crime lab, to Mary Green . . . to try to test for DNA?[7]  How about this?  How about the blue OtterBox?  According to [Mr. El-Amine] the robber took this in his hand.  Obviously gave it to [Dayquan].  But they could have tested this.  Mary Green told you and you'll be able to touch it yourself.  They can get DNA off plastic surfaces like this.  They didn't do that.  I don't know why.  They could have.  It wouldn't have been that hard, but they chose not to.  I wish they had.  So, no OtterBox DNA.
>
> What about fingerprints?  I know in the age of DNA it seems a little outmoded maybe, but there are still people who do fingerprints.  The State chose not to do that.  Could have done that.  Could have tried on both the gun and the OtterBox, but they did neither.  Again, wish they had.

In the State's rebuttal argument, the prosecutor responded as follows:

> [THE STATE]:  And putting out DNA, finger prints, that is all a red herring to confuse you.  Because if we had that . . . OtterBox, [appellant's counsel] would be up here saying oh all it does is show –
>
> [APPELLANT'S COUNSEL]: Objection.
>
> [THE STATE]:  – that [appellant] touched the OtterBox.  Not that he committed the robbery.  What if there was his DNA on the OtterBox?  Oh he touched it, they're together all the time.  They sleep over at each other's houses, they're riding around in cars together.
>
> [APPELLANT'S COUNSEL]: Objection.
>
> THE COURT: Overruled.

---

[7] Mary Green, a forensic biologist with the Montgomery County Police Crime Laboratory, testified for the State that she analyzes items of evidence in connection with criminal investigations, and performs DNA testing.  In this case, she examined DNA swabs only from the firearm found in the doghouse.

[THE STATE]: That's exactly what would be said. It is a red herring and we're asking you to focus on the evidence that we have given you which beyond all doubt proves that. . . .

We disagree with appellant's characterization of the State's closing argument. The State's argument did not, as appellant contends, insinuate that appellant's DNA and fingerprint were found on the iPhone case. Rather, it was merely a response to appellant's counsel's argument regarding forensic evidence, asserting that the lack of DNA evidence and fingerprints was irrelevant, a "red herring." The prosecutor asked the jury to focus, not on this "red herring," but "on the evidence that we have given you." We perceive no error.

## II.

### Jury Instructions

Appellant's next contention involves the court's instruction to the jury regarding eyewitness identification. He asserts that the instruction was improper because Mr. El-Amine's eyewitness identification was "uncertain" and "dubious."

The State contends that we should not review this claim because appellant affirmatively agreed to the instruction given. Moreover, it asserts that there was no error, much less plain error, because Mr. El-Amine's selection of appellant's photo in the photo array constituted "some evidence" to generate the instruction.

Prior to instructing the jury, the court discussed the jury instructions, as follows:

THE COURT: Okay. Pattern instruction 3.30: identification of Defendant?

[PROSECUTOR]: Yes.

-15-

[APPELLANT'S COUNSEL]: Yes.

The court then gave an instruction consistent with Maryland Criminal Pattern Jury

Instruction ("MPJI-Cr") 3:30,[8] as follows:

> The burden is on the State to prove beyond a reasonable doubt that the offense was committed and that George Pickett was the person who committed it. You have heard evidence about the identification of George Pickett as the person who committed the crime. You should consider the witness's opportunity to observe the criminal act and the person committing it including the length of time the witness had to observe the person committing the crime, the witness's state of mind, and any other circumstance surrounding the event. You should also consider the witness's certainty or lack of certainty, the accuracy of any prior description, and the witness's credibility or lack of credibility as well as any other factors surrounding the identification.

> You have heard evidence that prior to this trial a witness identified George Pickett in a photo array. The identification of George Pickett by a single eye witness as the person who committed the crime if believed beyond a reasonable doubt can be enough evidence to convict George Pickett. However, you should examine the identification of George Pickett with great care. It is for you to determine the reliability of any identification and give it the weight you believe it deserves.

Appellant made no objection to the instruction as given.

_____

[8] Maryland Criminal Pattern Jury Instruction ("MPJI-Cr") 3:30 states as follows:

The burden is on the State to prove beyond a reasonable doubt that the offense was committed and that the defendant was the person who committed it. You have heard evidence regarding the identification of the defendant as the person who committed the crime. In this connection, you should consider the witness's opportunity to observe the criminal act and the person committing it, including the length of time the witness had to observe the person committing the crime, the witness's state of mind, and any other circumstance surrounding the event. You should also consider the witness's certainty or lack of certainty, the accuracy of any prior description, and the witness's credibility or lack of credibility, as well as any other factor surrounding the identification.

-16-

Appellant acknowledges that, because he did not object to the instruction, his contention in this regard is not preserved for this Court's review. *See* Md. Rule 4-325(e) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."); Md. Rule 8-131(a) (An appellate court ordinarily will not decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court."). Not only did appellant fail to argue below that the court's instructions were erroneous, he affirmatively agreed to the instruction.

Appellant argues, however, that we should review this claim for plain error. In *Kelly v. State*, 195 Md. App. 403 (2010), *cert. denied*, 417 Md. 502, *cert. denied*, 131 S. Ct. 2119 (2011), this Court recognized that we have discretion under Md. Rule 8-131(a) to address an unpreserved issue. We stated, however, that

> [i]t is a discretion that appellate courts should rarely exercise, as considerations of both fairness and judicial efficiency ordinarily require that all challenges that a party desires to make to a trial court's ruling, action, or conduct be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge.

*Id.* at 431 (citations and quotations omitted).

We further stated:

> "Plain error is 'error which vitally affects a defendant's right to a fair and impartial trial.'" Appellate courts will exercise their discretion to review an unpreserved error under the plain error doctrine "only when the 'unobjected to error [is] compelling, extraordinary, exceptional or fundamental to assure

-17-

the defendant a fair trial.'" "[A]ppellate review under the plain error doctrine '1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon.'"

*Id.* at 431-32 (citations omitted).

Appellant has not convinced us to exercise our discretion to engage in plain error review in this case, where the court gave a pattern instruction, to which appellant's counsel agreed and referenced in her closing argument.[9] This is not one of those rare cases that warrants plain error review.

## III.

## Admission of Photographs

Appellant's next contention involves the admission of photographs. He asserts that the court erred in admitting these photographs because the State failed to authenticate them, and they were prejudicial. The State contends that this Court should decline to engage in plain error review of this claim.

## A.

## Proceedings Below

Prior to trial, the State moved *in limine* to introduce a video captured by a Montgomery County Police surveillance camera approximately two hours before the robbery

---

[9] In closing argument, appellant's counsel emphasized how little Mr. El-Amine could see of his assailant and how quickly the robbery took place. Counsel stated: "And I know that you'll look carefully at the judge's instruction to you – actually, you'll listen carefully to what the judge said about identification and how carefully you have to look at identification because that's what this case is all about."

of Mr. El-Amine. The videotape depicted appellant and Dayquan attempting to steal a police "bait car" located at 525 Thayer Avenue, 7/10 of a mile from the scene of the crime at issue in this case.[10]

The trial court agreed with appellant that the videotape of the bait car incident should be excluded as impermissible other crimes evidence that was unduly prejudicial. It ruled, however, that the State could introduce photographs derived from the video that "distinctively show [appellant] and his hairstyle," as well as appellant and Dayquan together. It stated that the photographs were to be admitted in a "very controlled" manner, with no reference to auto theft. Rather, the photographs would be accompanied by testimony that they were "taken by Montgomery County Police equipment."

At a subsequent hearing, appellant's counsel asked the court to revisit the issue of allowing the State to introduce the photographs as those taken by police equipment. After the court noted that it made that ruling to prevent an authentication issue, appellant's counsel suggested that the photographs be identified as taken by "Montgomery County government equipment" at 525 Thayer Avenue at 12:24 a.m. on February 10, 2013. Appellant stated that he was willing to stipulate to the admission of the photographs so identified, as long as he could preserve his earlier objection on "other crimes" and prejudice grounds. The prosecutor, however, stated that she would introduce the photographs through the testimony

---

[10] Before trial in this case, appellant pled guilty to attempted theft of a motor vehicle arising out of the videotaped bait car incident.

of Detective Hart. The court clarified that the State could ask Detective Hart about "where it was taken, the time, the location" and establish that the photographs were taken by "Montgomery County government equipment."

Consistent with appellant's suggestion and the court's ruling, Detective Hart identified the photographs, stating only that they were taken by "Montgomery County government equipment" on February 10, 2013, at 12:24 a.m., at 525 Thayer Avenue in Silver Spring. He further testified that the photographs were taken 7/10 of a mile from were Mr. El-Amine was robbed, approximately two hours prior to the robbery. Appellant did not object to Detective Hart's testimony or to the introduction of the photographs.

**B.**

**Appellant's Contention**

Appellant argues on appeal that, because Detective Hart "failed to offer first-hand knowledge about the photographs or the process used to produce them," and "failed to establish a chain of custody," the State failed to authenticate the photographs. He also contends that the photos were prejudicial, asserting that the photographs were the "only evidence" placing him in the vicinity of the 7-Eleven during the period of time leading up to the assault.

As we previously indicated, plain error review is a "rare, rare phenomenon," undertaken only when unobjected to error is extraordinary. *Kelly*, 195 Md. App. at 432. Here, where appellant initially stipulated to the admission of the photos, and the State's

limited questioning was at the request of appellant, we decline to exercise our discretion to engage in plain error review.

## IV.

## Exclusion of Evidence

Appellant's final contention is that the court improperly excluded evidence of GPS data that would have shown that the stolen iPhone was in Dayquan's possession in the days following the crime. The State contends that this claim is moot because appellant's counsel stated that he was not seeking to admit such evidence, and he never made a proffer regarding the evidence he wanted to elicit. In any event, the State asserts that the claim is without merit because evidence that the "Find My iPhone" app located the phone at Dayquan's residence "was neither relevant nor authenticated."

## A.

## Proceedings Below

Mr. El-Amine's iPhone5 was never recovered. Mr. El-Amine testified that he had an application on his iPhone5 called "Find My iPhone App," the purpose of which is to locate a cellular phone that is missing or stolen.

On cross-examination, appellant's counsel asked Mr. El-Amine whether he tried to use the app on the night of the robbery. Mr. El-Amine responded in the affirmative, and defense counsel asked if he was able to do that. The prosecution objected, and the following ensued at a bench conference:

[PROSECUTOR]: This is going to bring the phone back to [Dayquan's] . . . house, but it's like three days later.  I mean, we never heard from, nor were we able to get any verified reference from Apple, so this is just like a screenshot of where he saw his phone pop up.

* * *

And none of it is verifiable.  One ping comes across from [Dayquan's]; we next have pings that were on 16th Street.  So, all of this could be hearsay as to where these pings popped up and what he read off of his mom's phone that he was using to try to find his phone.

[2nd PROSECUTOR]: Those pings have to come in through Apple . . . .

THE COURT: Well, she's not asking about the pinging.

[PROSECUTOR]: She's about to.

THE COURT: She's just asking him what it says.

[PROSECUTOR]: Well, asking what it says is a ping.  What it said is where the phone is.

* * *

So, that's hearsay that's coming over this device, his mom's device to him.  That is not admissible.

THE COURT: Yeah, but it's someone he saw.

[PROSECUTOR]: Yeah, but it's still not admissible if he's not allowed to say that, "Apple sent me a text that said 'this'."  We would need to have records from Apple that say that.

[APPELLANT'S COUNSEL]: Well, right now I'm not asking about what it said, *I'm just asking if he has the application and if he tried to use it.*  So I don't think I've gone –

[PROSECUTOR]: All right.  Well, if we go any further, that's what we thought.

-22-

[2nd PROSECUTOR]: The result of where that ping comes . . . would be hearsay.

THE COURT: Okay. *But she's not asking any of that. She's asking did he have the app and did he try to use it, is as far as we got.*

[PROSECUTOR]: Okay.

THE COURT: So, overruled.

(Emphasis added).

Immediately after the court overruled the State's objection, the following took place:

THE COURT: Okay. You want to restate the question or repeat it so he'll understand. *Do you remember the question?*

[MR. EL-AMINE]: *Yes.*

THE COURT: Okay. Well then we got to – okay. Go ahead.

[MR. EL-AMINE]: *Well, I was able [to] log onto the computer to that – I'm not sure if they located the phone that night. I know everyday that night and everyday after that, I looked for it.* I remember there was a –

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[APPELLANT'S COUNSEL]: *So, you did try to use that application?*

[MR. EL-AMINE]: *Yes.*

[APPELLANT'S COUNSEL]: Okay. All right. Let me ask you some other questions. Excuse me, one moment. A couple days later did you get a phone call? Is that what happened? From the police asking you to come to the station?

[MR. EL-AMINE]: Yes.

(Emphasis added). Appellant's counsel did not ask any further questions regarding the "Find My iPhone" app.

On appeal, appellant claims that the court erred in excluding, on hearsay grounds, "exculpatory evidence tending to show that [Dayquan], and not [appellant], was the assailant." He asserts that the data on the "Find My iPhone App" was "admissible to show that the stolen iPhone was in [Dayquan's] possession in the days following the crime."

The colloquy listed above, however, shows that appellant did not present that issue to the trial court. Appellant's counsel initially stated that she was "just asking" if Mr. El-Amine had the "Find My iPhone" app and "whether he tried to use it." That testimony was elicited. When Mr. El-Amine subsequently began to answer a question beyond that which was asked, the prosecutor objected. As the State notes, the court may have sustained the objection because Mr. El-Amine was exceeding the scope of the question, or because he was going to give an answer to a question that appellant had assured the court he would not elicit. Appellant did not ask any further questions on the subject.

Nor did counsel make any proffer regarding the evidence that she sought to elicit. "Where evidence is excluded, a proffer of substance and relevance must be made in order to preserve the issue for appeal." *South Kaywood Cmty. Ass'n v. Long*, 208 Md. App. 135, 163 (2012) (quoting *Sutton v. State*, 139 Md. App. 412, 452 (2001)). *Accord Conyers v. State*, 354 Md. 132, 164 (proffer as to substance and importance of the expected answers was required to preserve issue for appeal), *cert. denied*, 528 U.S. 910 (1999) .

Here, defense counsel failed to proffer below the substance of the expected answer (to the question he never asked).[11]  And more importantly, even assuming that it could be inferred that the app showed that Mr. El-Amine's phone was at Dayquan's house, defense counsel never proffered how he would show that this evidence was relevant, i.e., that the iPhone app produced accurate results regarding the location of a phone.  *See United States v. Espinal-Almeida*, 699 F.3d 588 (1st Cir. 2012) (discussing foundational requirements for admission of GPS data).  Because appellant's counsel did not ask a question seeking to elicit an answer that he now says was improperly excluded, and because counsel did not proffer how such an answer was properly admissible, this issue is not preserved for appeal. Accordingly, we will not address it.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[11] The only indication in the record concerning the substance of the expected testimony was the prosecutor's statement that "[t]his is going to bring the phone back to Dayquan's house, but it's like three days later . . . .  And none of it is verifiable.  One ping comes from across from Dayquan's; we next have pings that were on 16th Street."