*Lloyd Harris v. State of Maryland*, No. 2298, September Term, 2017.  Submitted on Brief: February 14, 2019.  Opinion by Battaglia, J.

**CRIMINAL LAW – RIGHT OF ACCUSED OF COMPULSORY PROCESS – RELEVANCY OF ALTERNATIVE SUSPECT EVIDENCE**

Trial judge properly exercised discretion in excluding from evidence material in which appellant proffered to insinuate that another individual had committed the crime for which he had been charged, including evidence of that individual's criminal conviction which consisted of similar underlying acts that occurred in the same area and around the same time of the acts underlying the charges faced by the appellant; the proffered evidence, however, did not give credence to the theory that someone other than the appellant committed the crime at issue, and therefore, was properly excluded pursuant to Maryland Rule 5-403.

**CRIMINAL LAW – DUE PROCESS – PRE-INDICTMENT DELAY**

Trial judge did not err in denying motion to dismiss based upon a 20-year pre-indictment delay where appellant failed to demonstrate that the State purposefully delayed the indictment to gain a tactical advantage, pursuant to *Clark v. State*, 364 Md. 611 (2001), and solely argued that the State recklessly disregarded the risk that delay would impair his ability to mount an effective defense, a standard not recognized by case law and that was not argued below.

**CRIMINAL LAW – ADMISSIBILTY OF EXPERT TESTIMONY – DUELING EXPERTS**

Trial judge properly exercised discretion in admitting the State's expert witness, concluding that the expert's testimony, juxtaposed by the testimony of the appellant's expert, provided the grist for the jury to best weigh, based upon a finding that the scientific testimony proffered, and the underlying methodology and conclusion thereof, was accepted by the relevant scientific community.

Circuit Court for Frederick County
Case No.: 10-K-16-057851

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2298

September Term, 2017

_____

LLOYD HARRIS

v.

STATE OF MARYLAND

_____

Berger,
Leahy,
Battaglia, Lynne, A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Battaglia, J.

_____

Filed:  October 30, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On October 2, 1996, the victim, then a 15-year old girl, was reported missing by her mother. Over two months later, her body was discovered in a wooded area of Frederick, Maryland. Prior to the discovery of the victim's body, appellant, Lloyd Harris, had resided at a "campsite" nearby in the wooded area, and, during the course of the investigation into the victim's death, became the primary suspect. The investigation largely concluded in 2000.

On January 22, 2016, a grand jury indicted Harris of first-degree murder, first-degree rape and third-degree sex offense, charges for which he was convicted by a jury sitting in the Circuit Court for Frederick County. The trial judge sentenced Harris to life in prison for the murder and rape convictions, which were to run concurrently, and merged, for sentencing purposes, the sex offense conviction. The issues in this case involve an alternative suspect, pre-indictment delay and expert testimony, as queued up by Harris in the following questions, which we have renumbered:

> 1. Did the trial court err when it granted the State's motion to exclude defense evidence regarding an alternate suspect?
>
> 2. Did the trial court err when it denied Mr. Harris's motion to dismiss due to pre-indictment delay?
>
> 3. Did the trial court err when it denied Mr. Harris's motion to exclude the testimony of the State's expert regarding acid phosphatase and "time since intercourse" on *Frye-Reed* grounds?

For the reasons set forth below, we shall answer Harris's questions in the negative and shall affirm the judgment of the Circuit Court.

## ALTERNATIVE SUSPECT

Before trial, the State filed a motion *in limine* to exclude evidence related to individuals who Harris contended were alternative suspects in the case. One of those individuals was Elmer Spencer, who had been convicted of first-degree assault in connection with an attempted rape which took place in Frederick, Maryland on October 9, 1996, days after the victim went missing. Harris had informed the State that he intended to introduce evidence related to Spencer's assault conviction to bolster the theory that Spencer was an alternative suspect:

- Call Michael Hansell to testify about his arrest of Elmer Spencer on October 9, 1996;

- Call the woman, who was assaulted, to testify that Elmer Spencer had attacked her on October 9, 1996[1];

- Introduce the police report in State v. Elmer Spencer, Frederick County Circuit Court Case No. K-96-021289;

- Introduce a Frederick News-Post article dated December 28, 2000 regarding Elmer Spencer as a potential suspect in the rape and murder of the victim; and,

- Introduce a true test copy of Circuit Court Case K-96-021289, State v. Elmer Spencer.

The trial judge subsequently held a hearing on the issue and orally granted the State's motion to exclude, but reserved Harris's ability to cross-examine the State's witnesses about information regarding potential suspects that was developed during the

---

[1] At the time of trial, both Elmer Spencer and the woman he had attacked had died.

course of the investigation. The State, then, would be able to introduce evidence as to why those suspects had been excluded as potential suspects.

During trial, before the testimony of Candace Mercer, a childhood friend of the victim, the State again orally moved to exclude testimony from Ms. Mercer regarding her having allegedly seen the victim and Spencer together shortly before her disappearance. Harris proffered that Ms. Mercer, when interviewed in either late 2016 or early 2017 by defense counsel, indicated that she may have seen Spencer in the victim's "neighborhood right around the time she disappeared." The State disagreed, contending that Ms. Mercer informed prosecutors that she "had no idea" when she had seen the victim with Spencer.

Both defense counsel and the prosecutor, however, also informed the trial judge that Ms. Mercer had never mentioned Spencer to the police during the initial investigation, proffering a two-page police report of her interview conducted in 1996 in which no mention was made of Spencer. The trial judge granted the State's motion to exclude the testimony, reasoning that, because Ms. Mercer never told anyone that she had seen the victim and Spencer together in October 1996, a statement elicited twenty-one years later was "too far removed":

> The first time that [Spencer] comes up is 21 years afterwards. She says, yes, she thinks she saw him about that time, and now she's expected to testify that she doesn't. I think it's too far removed. If there was any mention whatsoever [sic] in the report of Mr. Spencer back at that time, I may have let her testify to that; there's not.

Furthermore, the State also sought to exclude testimony from Thomas Chase, the former head of the Criminal Investigation Division of the Frederick City Police Department, recounting the statement he made to a local newspaper in which he said that

3

Spencer could not be ruled out as a suspect in the rape and murder of the victim.[2] The trial judge denied the State's motion, and Mr. Chase later read his statement to the jury. Mr. Chase, however, testified that he did not believe Spencer to ever be a suspect, and that if he had "not gotten" the call from the reporter, he "wouldn't have thought of Spencer" as a suspect; his goal was merely to provide "[t]ruthful information."

Harris contends that the evidence regarding Elmer Spencer "was not speculative or remote" because it tended to demonstrate that Spencer raped and murdered the victim, and as such, the trial court committed reversible error when it granted the State's motion *in limine*.[3] Harris avers that the evidence related to Spencer did more than "cast a bare suspicion" of his culpability because the acts underlying Spencer's assault conviction were similar to the acts underlying the charges with which Harris had faced, both incidents occurred in Frederick around the same time and Spencer had an opportunity to commit the crime because he was not incarcerated at the time of the victim's disappearance.

The State, conversely, argues that the trial court did not abuse its discretion in excluding the evidence regarding Spencer because the evidence was irrelevant as it

---

[2] When asked by a reporter from the Frederick News-Post whether "there's any connection between Elmer Spencer and the [victim's] case," Thomas Chase stated:

> The issue is being taken into account, and is being given serious consideration. Given the best information we have, Spencer was not in jail at the time [the victim] was reported missing, and he was arrested on October 8th for the assault of another Frederick woman. That's all I can say. We have developed suspects. We are not ruling out any possibilities.

[3] We review the trial court's decision to exclude evidence for an abuse of discretion, not, as Harris posits, under a *de novo* standard.

"supported only a conjectural inference that Spencer committed the crime for which Harris was on trial, and even if minimally relevant, its significant potential for unfair prejudice warranted exclusion under Maryland Rule 5-403."

"Although the right of a defendant in a criminal trial to present witnesses in his defense is a critical right, it is not absolute." *Taneja v. State*, 231 Md. App. 1, 10 (2016), *cert. denied*, 452 Md. 549 (2017) (citing *Taylor v. Illinois*, 484 U.S. 400, 407–10, 108 S. Ct. 646, 98 L.Ed.2d 798 (1988)). The accused may not offer testimony that is "incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id.* (quoting *Taylor*, 484 U.S. at 410, 108 S. Ct. 646, 98 L.Ed.2d 798). The admissibility of "evidence that someone other than the defendant committed other crimes or bad acts," *Allen v. State*, 440 Md. 643, 664 (2014) (internal citation omitted), is "subject, however, to two paramount rules of evidence, embodied both in case law and in Maryland Rules 5-402 and 5-403," *Smith v. State*, 371 Md. 496, 504 (2002); *Muhammad v. State*, 177 Md. App. 188, 274 (2007).

"Relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. "[A]n item of evidence can be relevant only when, through proper analysis and reasoning, it is related logically to a matter at issue in the case, *i.e.*, one that is *properly provable* in the case." *Taneja*, 231 Md. App. at 11 (emphasis in original) (quoting *Snyder v. State*, 361 Md. 580, 591 (2000)). Relevant evidence is admissible, while evidence that is not relevant is not admissible. Md. Rule 5-402. Although relevant, a trial judge may exclude evidence "if its probative value is

5

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5-403.

To establish the evidentiary relevance of crimes committed by another, a defendant "must show that 'the proffered evidence exculpates the defendant or gives credence to the theory that someone else other than the defendant committed the crime.'" *Allen*, 440 Md. at 665 n.16 (citing *Moore v. State*, 154 Md. App. 578, 603–04 (2004), *aff'd*, 390 Md. 343 (2005)). If relevant, the proffered evidence must also, then, pass the Rule 5-403 balancing test—"that is, its probative value must not be outweighed by the danger of unfair prejudice." *Id.* at 665. An accused may "introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged," but, such evidence "may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial." *Holmes v. South Carolina*, 547 U.S. 319, 327, 126 S. Ct. 1727, 164 L.Ed.2d 503 (2006) (quoting 40A Am. Jur.2d, Homicide § 286, pp. 136–38 (1999)); *see also Taneja*, 231 Md. App. at 10–11. We review a trial court's decision to exclude evidence of another's prior bad acts for an abuse of discretion. *Moore v. State*, 390 Md. 343, 384 (2005).

In *Allen v. State*, *supra*, 440 Md. at 676–77, the Court of Appeals held that a defendant's constitutional right to present a fair defense at trial had not been violated when the trial judge excluded evidence regarding an alternative suspect which included the suspect's DNA being found at the scene of the crime for which Allen had been charged, as

6

well as the suspect's recent guilty plea to a similar "home invasion drug-rip style robbery" committed in the same county. The Court agreed with this Court when we held that the prejudicial effect of the DNA evidence and the alternative suspect's recent conviction of an allegedly-similar crime outweighed any slight probative value regarding the alternative suspect's alleged involvement in the crimes for which the defendant was on trial. *Id.* at 665. According to the Court, admission of the DNA evidence would have resulted in a mini-trial, because the State would have used gang evidence and evidence of robbery kits to rebut the inference that the alternative suspect had committed the robbery and assaults at issue, which would have misled and confused the jury, running afoul of Rule 5-403. *Id.*

In *Taneja v. State*, *supra*, 231 Md. App. 1, we held that the trial judge properly exercised his discretion in excluding evidence, which Taneja sought to introduce, that another individual murdered the victim. At trial, Taneja sought to insinuate that his wife's son had committed the murder for which he had been charged by questioning the son about:

> the replevin lawsuit he brought against [the victim] in 2010, a statement he made about her around that time that "someone should kill that b[itch]"; living in the area where [the victim] was murdered; being familiar with weapons; selling Taneja's Germantown home after he was given power of attorney following Taneja's arrest; and a statement he made to Taneja in late 2011 or early 2012 that Taneja should go to a shooting range.

*Id.* at 18. The trial judge excluded the proffered testimony on the ground that it would not "make more probative the defense in this case, that [Taneja] was not directly involved in" the criminal activity for which he was being prosecuted. *Id.* at 16–17.

In affirming the decision of the circuit court, we agreed that the proffered testimony "would have been, at best, only tangentially relevant and had a high probability of

7

confusing, distracting, and misleading the jury." *Id.* at 18. We concluded that the evidence Taneja sought to introduce was "disconnected and remote" with "no other effect than to raise the barest of suspicion" that Taneja's stepson might have murdered the victim. *Id.*

In the instant matter, the evidence regarding Spencer, specifically the testimony of the officer who arrested him, the police report resulting from the investigation into Spencer's assault charge, the news article identifying Spencer as a potential suspect, and a true test copy of his circuit court case did not give "credence to the theory that someone else other than [Harris] committed the crime." *Allen*, 440 Md. at 665 n.16.

The judge also properly precluded Ms. Mercer from testifying at trial that she may have seen Spencer and the victim together around the time of the disappearance, which she had not reported in 1996. The judge, however, had permitted Harris to raise the issue of an alternative suspect by questioning law enforcement witnesses about other potential suspects in the case. The trial judge's decisions were based on a sound use of his discretion.

## PRE-INDICTMENT DELAY

Harris next challenges the twenty-year delay between the discovery of the victim's body and his indictment, contending that his due process rights were violated by the State.

Prior to trial, Harris filed a Motion to Dismiss Due to Pre-Indictment Delay. During the hearing on the matter, Harris argued that he had been prejudiced by the delay, because certain witnesses were no longer available to testify and items of evidence allegedly no longer existed:

- James Sexton, deceased, "was a reasonable suspect in the investigation, and [investigators] also took his DNA for comparison against the victim, and things like that. . . . [T]here's information that he had contact with

8

my client, and talked to him, and told him he was going to take portions of his camp, which is where the body was recovered";

- Rose Lanzetta, deceased, a forensic analyst who "analyzed the blanket that was found covering the body in this case. In her review of the blanket, she discovered hairs, and she reviewed those hairs and compared them . . . . The hairs were not a match with Mr. Harris. . . . [H]er testimony or her lack thereof her testimony is, there's an impossibility of us to present that exculpatory information to the jury because she is no longer able to be a witness";

- Corinne Winters, currently residing in London, and a friend of the victim, told detectives that she had seen the victim the day after she disappeared;

- Jamie Hurst, also purportedly saw the victim after she disappeared, but who defense counsel added, "I don't know if she's available or not";

- "[L]ost or destroyed" recordings of police interviews, including "at least one of Mr. Harris's interview and then one of, one interview of [the victim's] brother," about which defense counsel proffered, "I would imagine there are others"; and,

- A "body wire recording during another interview of Mr. Harris; that there was video surveillance of Mr. Harris during one of the interviews in 1998. And none of those are in existence." Defense counsel asserted, "[w]e've asked for them and I believe the State has looked for them, but regardless, they're no longer in existence. They don't possess them."

Defense counsel continued to explain the significance of the missing material:

> Rest assured, Your Honor, I believe if there was, if it was, you know, helpful to them, they would have it. But they, you know, I mean, there's a memorialization of what [Harris] said, that I would say the negative things that he said. Those are all memorialized in the reports.
>
> But if there's one statement here or there that he made that could be helpful to us, it's probably not in those reports because it didn't further their case. And I'm not saying they're trying to hide anything, but I'm saying there's no way that every single statement he made is memorialized in this.
>
> For example, in 1998 . . . [Harris] was interviewed for six hours and there is a one-page report by Detective Hutchinson. Where are the rest of his statements in those six hours?

9

If there was a body wire recording, which there's reference to that, I don't know for sure if there was, that would be immensely helpful because, as it is, I have no context of these statements. He supposedly made all kinds of statements, and I don't know what the officer said to him to get him to say that.

Certainly, [Detective] Hutchinson is going to testify . . . but again, how is, he's not going to have independent recollection of what Mr. Harris said or what he said back in 1998. Because the best recollection of that would be those recordings, and Your Honor, we don't have those recordings. And I think whether or not they're exculpatory or helpful to us, we're still entitled to them, and it's so prejudicial that we don't have access to them.

And that begs the question, again, Your Honor, what other evidence has been lost? If they, I mean, they knew that they were pursuing this case as a cold case, they were working on it, they knew it was, they were hoping, I guess, it was going to go to trial at some point, and they've lost these recordings. What else has been lost?

\*\*\*

The next thing that I would touch on would be faded memories here; that is, what witnesses do not remember, 20 years later, what happened on October 1st or December 1996.

The trial judge then noted that the State would be faced with similar issues regarding "faded memories," to which defense counsel again argued that it was his client solely being prejudiced by the delay. Counsel for Harris also posited that there had been an "issue of talking to witnesses where a lot of them don't want to recall necessarily what happened." She continued, further explaining the prejudice Harris faced by the delay, particularly the difficulty in procuring an alibi:

One other thing is the lack of ability to procure an alibi for my client. As far as I know, they never really looked into his alibi. They knew he wasn't working, but they don't know what he did that day. There's no reference anywhere in any reports as to what he did that day.

And now, 20 years later—he was never charged—so 20 years later, his ability to recall what he did on October 1st of 1996, nothing. There's literally nothing there that he can recall in specificity.

10

Lastly, counsel for Harris argued about the scientific evidence in the case:

> [O]ne final thing in regards to the prejudice will be this acid phosphatase testing results that we, that I mentioned in there. Those results, in an e-mail from the State, indicate that they were destroyed, they would have been destroyed three years after the, I guess, the test would have been done.
>
> And we have the one-page results which has some number. And based on that, we can't conduct any sort of independent review of that with our expert because he doesn't have any of the underlying data, the controls. I mean, he can't even surmise what, you know, measurement they used because the information's not there. The controls aren't there and we can't do anything with that.

Defense counsel, acknowledging, pursuant to *Clark v. State*, 364 Md. 611 (2001), that Harris would have to demonstrate both "substantial prejudice" and that the delay to indict "was the product of a deliberate act by the government designed to gain a tactical advantage," began to explain how the State acted to gain such a tactical advantage:

> And moving on to the second prong would be that the State acted to gain a tactical advantage. As I noted in my motion, . . . [i]t's extremely difficult to prove that. Without some kind of e-mail or something, we don't have the, you know, the specific thing that says, yeah, they waited to charge him.
>
> But what we do have is all of these other things, and that would be that they could have—and I understand the State saying they didn't have to charge him when they had probable cause, I absolutely agree with that—but they could have charged him years ago because of all this other prejudice that has now developed.

She then posited that, in the typical situation involving a cold case, a subsequent indictment ensues when a "smoking gun" is found or the case is otherwise "cracked," such as a "DNA hit" or other new evidence, which, she averred, did not exist here. Counsel for Harris concluded by positing that dismissal was required because, although she could not directly prove purposeful delay, the circumstances surrounding the lack of prosecution demonstrated a lack of diligence which severely harmed Harris:

11

Your Honor, at best here, we have a lack of diligence in charging him sooner. At worst, we have the State purposefully acting to gain a tactical advantage. Again, it's difficult for us to show that, but I think all of the inferences here can lead to only that conclusion; that he, they wanted to benefit from their delay. There's no other way to come to that conclusion.

The State, initially, responded by stating that "there is no prejudice with regard, and surprisingly none after 20 years, with regard to this case, and that there's certainly no[] purposeful tactical advantage with regard to the State." The prosecutor then began to address the points of prejudice raised by Harris:

> There's reference of a body wire tape that Detective Hutchinson had on him during the six-hour interview [with Harris] in 1998. I was one of the people that was able to hear that tape.
> And for those of us who did cases back then, it, you know, it's a wire underneath clothes, it's, you know, you can hear Detective Hutchinson, barely hear the defendant. Every time somebody moves, there's scratching on the tape. Quite frankly, I think the quality wouldn't have been one that would have been admitted anyway.
> But notwithstanding that, something on that tape was, if I did it, it was an accident. Losing that tape, I don't know how that would benefit the State, and certainly, I don't know how that would prejudice the defendant.

The prosecutor proceeded to address the specific witnesses that counsel for Harris identified as no longer being available to testify at trial, noting the lack of prejudice resulting from their unavailability:

- James Sexton, although deceased, had indicated to investigators that he had not resided in the wooded area in which the victim's body was found since the Summer of 1996;

- The hairs which Rose Lanzetta had analyzed had been offered to defense counsel for independent testing, but, as the prosecutor noted, defense counsel had not "taken us up on that";

- The State would look into ways in which Corinne Winter's testimony could be obtained;

12

- Jamie Hurst "has been subpoenaed . . . She's coming. So I think that's moot at this point"; and,

- John Ramsey had always been an out-of-state witness, as he worked at a carnival that came through Frederick some time before the victim's disappearance.

As to Harris's alibi, the prosecutor contended that, because Harris had been interviewed as a suspect in the rape and murder of the victim on multiple occasions, he had reason to provide an alibi, which investigators could then check, but he had not provided one.

With respect to the scientific evidence, the State responded:

> With regard to the acid phosphatase test, it wouldn't have made a difference in 2000 because they destroy them every three years. And what they're asking for is something that's not demanded for in discovery with regard to this type of test. They're asking for, like the instrument tests and the protocol. They got the protocol, but the actual instrument, the level – I can only compare it to what we do to DNA, which is sort of all of those, you know what I'm talking about.
> 
> ***
> 
> And, but we do have the doctor who was there, who will testify to the levels. But with regard to this type of test as compared to DNA, those types of things are not discoverable.

Lastly, the State contended that only "actual prosecutorial misconduct rather than mere negligence" would satisfy the second *Clark* prong, whether the State stood to gain a tactical advantage in delaying the indictment. She further posited that, the State, did in fact have new evidence; although it may not be a "smoking gun" as defense counsel posited would be necessary to overcome the delay in indictment, the State, nonetheless, possessed

13

new evidence. The State, however, contended that possession of new evidence was not required to insulate its decision to delay indictment from dismissal.[4]

The trial judge ultimately found that, although Harris may have been prejudiced by the delay, he had failed to prove that the State purposefully acted to gain a tactical advantage, finding that the delay was a result of permissible prosecutorial discretion:

> First of all, Maryland does not have a statute prescribing the time in which a prosecution for a felony must be commenced. That's – well, how do you prove a negative? You prove it by citing the case that cites it, Smallwood v. State, 51 Md. App. 463, 1983 case.
>
> And as the State indicated, Clark v. State puts forth the two-prong test. Number one, has the defendant suffered actual prejudice from the delay; and two, the delay was the result of a purposeful attempt by the state to gain tactical advantage over the defendant.
>
> Regarding the first prong, I think it's clear the defendant has suffered some prejudice. I think the State has too. 20 years is going to make it difficult for both sides. But the only thing I have to find is whether the defendant suffered the prejudice.
>
> But as counsel indicates, it's difficult to show that the State, that the delay was a purposeful attempt by the State to gain a tactical advantage. And I've thought about this a good bit because, obviously, this is a very crucial motion for the Defense.
>
> You can see, in certain cases, a speedy trial case, for instance, where the state has some problems with their case. They've indicted, they get up close to trial, enter a nolle pros, and then a year or so later, they indict, getting around the 180-day rule and whathaveyou [sic]. At that point, that's a purposeful act to get around the execution of a particular rule, statute, whathaveyou [sic], to gain a result.
>
> But here, what we have is, at the time, we have a police investigation ongoing. It's overseen by the State's Attorney Office. The State's Attorney's Office – what's been alleged, because I don't have any testimony

---

[4] After being asked by the trial judge what new evidence the State possessed, the prosecutor stated that, among other things, "at a minimum, we have a statement from the defendant where he all but says he did it. In fact, he says he did it, but he doesn't remember doing it. So at a minimum, there's a new statement from the defendant." The prosecutor assured the court that it did not possess any evidence which it was required to disclose to the defense. The prosecutor also indicated that the crux of the decision to prosecute now resulted from a re-evaluation by "fresh eyes" of the evidence already collected.

14

to this, but I have, certainly, in pleadings and in argument – that the State's Attorney's Office made determinations that they did not want to indict at particular times.

How often that occurred, I don't know. That's certainly not in anything that's been presented, but it certainly was, has been alluded to, that was made by then State's Attorney [] and his . . . head of the murder division[.]

And that's prosecutorial discretion, obviously.

And then to say that they did this, now you have to say that when [the next State's Attorney assumed office], he would have had then to make the same determination that, no, I'm going to push this out farther and hope that there's additional prejudice to [Harris], and for, until 20 years come up.

I just don't think the Defense has met their burden in showing a purposeful attempt by the State to gain a tactical advantage at this time.

Now, there are, we've danced around several things in this motion. Counsel's hitting very had on several things that, at least at this time, are speculative. I suspect that they will be raised later if, in fact, the speculation becomes actual, as opposed to there [sic]. And I don't know. I may feel differently about it at that time. But at least at this time, I don't believe they've met the second prong, and so I'm going to deny the motion to dismiss.

In evaluating the decision of the trial court, we are mindful that due process may require the dismissal of an indictment if it is shown that a pre-indictment delay caused an accused "actual, substantial prejudice and that the delay was the product of a deliberate act by the government designed to gain a tactical advantage." *Clark*, 364 Md. at 631 (citing *United States v. Marion*, 404 U.S. 307, 92 S. Ct. 455, 30 L.Ed.2d 468 (1971) and *United States v. Lovasco*, 431 U.S. 782, 97 S. Ct. 2044, 52 L.Ed.2d 752 (1977)); *see also Greene v. State*, 237 Md. App. 502, 520 (2018). An accused maintains the burden of establishing both that he or she was prejudiced by the delay and that the State manipulated the delay to gain a tactical advantage over the accused. *Clark*, 364 Md. at 642–43; *Greene*, 237 Md. App. at 521 (citing *Smallwood v. State*, 51 Md. App. 463, 472 (1982)). Prejudice, which results from the passage of time, could include the impairment of memories, the loss of

15

evidence, the unavailability of witnesses and the decreased ability to defend. *Clark*, 364 Md. at 625–26; *Greene*, 237 Md. App. at 520. Juxtaposed against purposeful acts to gain a tactical advantage are a number of "good-faith and well-reasoned bases" the State has for a pre-indictment delay, such as the consolidation of multiple cases into one joint trial and allowing evidence to adequately develop. *Greene*, 237 Md. App. at 521 (citing *Smallwood*, 51 Md. App. at 465–66).

In the present case, Harris, on appeal, does not argue that the State purposefully delayed his indictment to gain a tactical advantage over him; he does contend, however, that the abundance of prejudice resulting from the delay was sufficient to require dismissal. His assertion, however, fails based upon his inability to demonstrate that the State deferred to seek the indictment to gain a tactical advantage, as required by case law. *See Clark*, *supra*, 364 Md. 611; *Green*, *supra*, 237 Md. App. 502; *Smallwood*, *supra*, 51 Md. App. 463. Accordingly, we hold that the trial judge did not err in denying Harris's motion to dismiss on the basis of a pre-indictment delay.

Nevertheless, Harris posits, citing, *United States v. Lovasco*, 431 U.S. 783, 795 n.17, 97 S. Ct. 2044, 52 L.Ed.2d 752 (1977), that a "due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." Harris, without any citation to any Maryland case,[5] contends that, because the State "amassed no new evidence" between 2000

---

[5] Harris also does cite *United States v. Eight Thousand Eight Hundred and Fifty*
(continued . . .)

and 2016, "the only conclusion that can be drawn from the State's" delay to indict "is that it was acting in reckless disregard" of his ability to mount an effective defense. As such, he advances, the charges against him should have been dismissed. Harris, however, did not argue this point before the trial court and will not be allowed to circumvent the judgment of a trial court.

The test suggested in *Lovasco*, moreover, has not been adopted as part of our jurisprudence. In *Clark*, 364 Md. at 642 n.21, the Court of Appeals, in a footnote, stated that "whether the U.S. Supreme Court intended that a demonstration of recklessness may be sufficient is unclear." It is clear that, "[o]ur obligation is to follow the clear dictates of the Court of Appeals. *Clark* set forth a two-part test for assessing pre-indictment delay and gave no indication that there should be exceptions[.]" *Willis v. State*, 176 Md. App. 1, 6 (2007) (holding that the test adopted by the Court of Appeals in *Clark* to challenge a pre-indictment delay applied to a challenge of an 18-year pre-indictment delay in theft prosecution).

---

(continued . . .)
*Dollars*, 461 U.S. 555, 563, 103 S. Ct. 2005, 76 L.Ed.2d 143 (1983) ("As articulated in *United States v. Lovasco*[], such claims can prevail only upon a showing that the Government delayed seeking an indictment in a deliberate attempt to gain an unfair tactical advantage over the defendant or in reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against the charges.") and *Betterman v. Montana*, __U.S.__, 136 S. Ct. 1609, 194 L.Ed.2d 723 (2016) ("Due Process Clause may be violated, for instance, by prosecutorial delay that is 'tactical' or 'reckless.'" (quoting *United States v. Lovasco*, 431 U.S. 783, 795 n.17, 97 S. Ct. 2044, 52 L.Ed.2d 752 (1977)), to support his assertion that dismissal of the indictment is required based upon the State's "reckless disregard" in delaying his indictment.

**EXPERT TESTIMONY**

Before trial, counsel for Harris sought to exclude testimony from the State's expert, Dr. Stephen Cina, who would testify that the level of prostatic acid phosphatase[6] found on the vaginal swabs taken from the victim allowed him to determine that the victim had sexual intercourse "within a few hours" of her death, contradicting Harris's claim that he had consensual intercourse with the victim three days before she went missing. The trial judge ultimately denied Harris's motion and permitted the testimony, a decision about which Harris takes issue.

In a motion requesting a *Frye-Reed* hearing,[7] counsel for Harris argued that, although, "[a]cid phosphatase testing in and of itself is not the subject of Defendant's challenge" to the State's expert testimony, Harris does take issue with "the conclusion proffered by the State's expert in regard[] to the timing of intercourse before her death." Counsel for Harris contended that the "expert's conclusions are not supported by generally accepted methods," particularly, because the literature in which the State's expert used to arrive at his conclusion did "not cite a study concerning a factually similar cadaver, in that none of the cadavers in the study were exposed to the elements for a period of 83 days."

---

[6] At trial, Dr. Stephen Cina, an expert witness for the State, explained that prostatic acid phosphatase is an enzyme, "specifically glycoprotein," which "is produced by the prostate and seminal vesicles" and is found in seminal fluid.

[7] *Frye-Reed* is the test in Maryland for determining whether expert testimony is admissible. The name is derived from two cases, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), where the standard of general acceptance in the relevant scientific community was first articulated, and *Reed v. State*, 283 Md. 374 (1978), where the Court of Appeals adopted the *Frye* standard. *See Blackwell v. Wyeth*, 408 Md. 575, 577 n.1 (2009).

In fact, defense counsel averred, most "of the literature provided relied upon live study subjects or recently deceased subjects held in a controlled environment[.]" Defense counsel asserted, because the "theory being propounded by the State's experts presents a novel medical theory of conclusion not generally accepted in medical or scientific communities," the court was required to conduct a *Frye-Reed* analysis to determine the admissibility of the subject of the expert witness's testimony.

At the *Frye-Reed* hearing held before trial, Dr. Stephen Cina, who had previously conducted autopsies as a fellow in the Office of the Chief Medical Examiner, was accepted as an expert in forensic pathology and testified on behalf of the State. He had conducted the victim's autopsy in 1996 during his fellowship at Johns Hopkins University. In advance of the hearing, he reviewed the autopsy report, which he co-authored as a fellow; the 2000 amendment to the autopsy report, which he had not authored, as he was not with the Office of the Chief Medical Examiner in 2000; the articles that the addendum cited; a lab report which indicated that a sperm head was found on one of the vaginal swabs; and a temperature chart from October through December of 1996. The 2000 amendment to the autopsy report, authored by Dr. Stephen Radentz and Dr. John Smialek of the Office of the Chief Medical Examiner, which is of importance to the instant appeal and formed the basis of Dr. Cina's conclusion, stated:

> Based on the evaluation of the acid phosphatase activity on vaginal swabs taken at the time of autopsy and a review of current literature, the deposition of seminal fluid occurred very close to or at the time of death of the decedent. The acid phosphatase activity level of 430 U/L could not be attributed to sexual intercourse 48 hours prior to her death. Studies involving volunteers (living patients) revealed that elevated acid phosphatase activity due to

19

seminal deposition (sexual intercourse) is generally not detectable after 24 to 36 hours.

Dr. Cina testified that he agreed with the amendment's statement, positing further that "the literature that has come out since then hasn't done anything to refute that." He advanced the notion that sexual intercourse with the victim occurred shortly before her death based upon, what he considered, to be a high level of acid phosphatase collected from her vaginal cavity:

> Well, I mean acid phosphatase if it is at a high level in most studies they will say that it correlates with a recent sexual activity. If you have a high level of acid phosphatase which is a major component of seminal fluid plus sperm you know you have dealt with an ejaculate in that body cavity. And it happened recently.

He further explained the basis for his theory:

> Well, in a living person acid phosphatase will break down. Certainly higher in the first few hours after sexual activity. It starts dropping 12 hours, 24 hours dropping and a lot of studies by 48 hours it is virtually gone or not detectible. So it is a fairly short lived substance in the vagina of a living person. Most people would say sperm sticks around a little bit longer than acid phosphatase but there are a few outlier studies that will say that sperm can go way before that.
>
> But if you see the two together in medicine we are taught if you hear hoof beats don't look for zebras. Look for the horse. So in a case where the circumstances suggest a sexually related crime you have a sperm head in the vagina and you have an elevated acid phosphatase level a medical diagnosis would be that there is seminal fluid that was deposited recently in the vagina.

Dr. Cina then addressed what levels of acid phosphatase correlate with recent sexual activity:

> I mean studies vary as to what a normal vaginal acid phosphatase level is. I've seen it as low as 8 or 10 units per liter. In some of the forensic literature in looking after coitus they would consider a level of either 50 or 100 to be indicative that recent sexual activity had occurred. In one study, Dr. Smialek, the chief [medical examiner], was involved in I believe every

20

case over 400 [units per liter] proved to have seminal fluid in it. In this case, we're looking at a level of 430 so it exceeds the threshold for many of the papers that I've read that seminal fluid should be present.

Dr. Cina also cited the "Dahlke" study[8] to support his opinion regarding the correlation between the presence of acid phosphatase and recent sexual activity. The study found that, after an alleged rape, "[t]he acid phosphatase value was more than 50 units [per liter] in 87% of the patients seen within six hours, in 60% of the patients seen between six and 12 hours, and in 40% of those seen between 12.5 and 18 hours." The study further found that a "high acid phosphatase value was not found after 18 hours[.]" Dr. Cina explained that the study revealed that acid phosphatase values above 300 units per liter were found in patients examined within eight hours of the reported rape; whereas, samples from a control group of woman who had no intercourse within forty-eight hours showed a mean acid phosphatase value of eight units per liter and none "had values of more than 50 [units per liter]."

Dr. Cina also agreed with the findings of another study[9] that "quantitative [acid phosphatase] levels can be used as a time since intercourse marker," and that the average "decay" of acid phosphatase, the time in which 50% of the tests become negative for the chemical, was thirty-two hours. He also endorsed the conclusion of the study's article which stated that "the limited survival of [acid phosphatase] in the female genital tract is

---

[8] Miriam B. Dahlke, et al., *Identification of Semen in 500 Patients Seen Because of Rape*, A.J.C.P., Dec. 1977.

[9] Lawrence R. Ricci, et al., *Prostatic Acid Phosphatase and Sperm in the Post-Coital Vagina*, Annals of Emergency Medicine 11:10, Oct. 1982.

useful because it is easy to state whether intercourse did occur within a certain period of time and that [acid phosphatase] was not merely persistent from previous consenting intercourse."

Dr. Cina, acknowledging that the studies on which he relied involved people above ground, explained why seminal fluid deposited in the body "on or about the time of death" resulted in high levels of acid phosphatase beyond forty-eight hours:

> Well, you think [acid phosphatase] would stick around longer for two reasons. Number one, the physiological processes that break down the enzymes they stop working just like they do everywhere else. So that would keep your acid phosphatase around.
>
> ***
>
> It would keep the level higher because it wouldn't dissipate and it wouldn't get broken down. The other thing is if you are dead you are not moving around and you are not engaging in physical activity. So any physical leakage would not happen. It would just sit there. So provided the body was cold enough the seminal fluid could stick around for quite a long time.

When asked if "the idea that these substances in the body at the time of death will stick around" is "a new or novel concept," Dr. Cina responded "[n]o. For example, going back to the gastric contents. People know gastric contents stick around in the stomach of a dead person for hundreds of years. The fact that physiological processes stop when you are dead has been known for hundreds of years."

On cross-examination, at the hearing and at trial, when asked if decomposition of the victim's body could have accounted for the high level of acid phosphatase, Dr. Cina admitted that it might, but further explained that because there was "a very low level in the rectum, and nothing in the oral cavity really suggests that you do have semen deposit in the vagina. If you want to say that, well, all of this was produced by bacteria after death

22

and decomposition, you'd expect to see elevated levels everywhere." He also stated that he was not aware of any studies which analyzed acid phosphatase levels of a person who had been deceased for three months, such that he could not rule out that decomposition may have affected the level to "some degree," but noted that "as I have stated before in the setting of a naked girl who is bound in a secluded area with sperm present in the vagina the natural medical conclusion is that the acid phosphatase is from seminal fluid."

At the conclusion of Dr. Cina's testimony, the defense called Dr. Karl Reich, the chief science officer at Independent Forensics, a forensic DNA laboratory in Lombard, Illinois, who was accepted as an expert in acid phosphatase, microbiology and molecular biology. Dr. Reich testified that, although screening for acid phosphatase is a method in which to detect semen in a rape victim, it is impossible to determine the time since intercourse based upon acid phosphatase levels. He contended that Dr. Cina's conclusion to the contrary "is unsupported by relevant experiments and is unsupported by any actual biochemical enzymic analysis from cadavers." Accordingly, in Dr. Reich's opinion, there is no marker, no laboratory test that will provide the time since intercourse, nonetheless, by measurement of acid phosphatase levels. In so concluding, Dr. Reich cited an article, entitled "A Critical Appraisal of the Value of Vaginal Acid Phosphatase Determination for the Estimation of Post Coital Time,"[10] from a Brazilian medical journal which reviewed 200 sexual assault cases. The authors of the article applied a "very simple mathematical

_____

[10] Affonso Renato Meira, et al., *A Critical Appraisal of the Value of Vaginal Acid Phosphatase Determination of the Estimation of Post-Coital Time*, Rev. Paul Med. 110(4), at 173–76, Jul./Aug. 1992.

analysis" to conclude that no correlation between acid phosphatase levels and the time since intercourse existed, a paper which Dr. Reich stated was "fully in line with the modern literature on this topic."

Dr. Reich also testified that acid phosphatase, albeit, generally associated with seminal fluid, may also be produced by bacteria and fungi. As such, Dr. Reich, in his report, explained that decomposing cadavers often produce large amounts of bacteria and fungi. He also noted that none of the studies on which Dr. Cina relied analyzed cadavers that had been left in the open, nor did they consider other factors which contribute to the existence of acid phosphatase or the physiological variation of the amount of seminal fluid produced by men.

Dr. Reich also took issue with the size of the sample collected from the victim, positing that it was "completely unknown and undeterminate": "Collect more semen on the swab and the test is likely more positive, collect less (or miss the semen altogether) and the tests will appear weaker or negative." Dr. Reich posited that none of the reports cited by Dr. Cina addressed this concern of his either.

Following the hearing, the motions judge denied defense counsel's motion to exclude evidence regarding prostatic acid phosphatase and the timing of intercourse, finding Dr. Cina's opinion to be based on generally accepted methodology within the relevant scientific community:

> All right, a hearing was held in this matter on June 27th when defendant's motion in limine to disallow the testimony of Dr. Stephen Cina, who is an expert named by the State as it relates to an estimate of time prior to death that sexual intercourse occurred. It is only this opinion that formed the basis for the defense motion and objection.

24

***

[P]ursuant to Re[e]d v. State, the primary question presented by the motion in limine is can the State support the opinion of Dr. Cina that intercourse took place within six to twelve hours or at least within 36 hours prior to death, with science that utilizes methods and theories that are generally accepted in relevant disciplines. Dr. Cina testified that he is an M.D., a forensic pathologist who has performed close to 7,000 autopsies. When queries as to whether he was a scientist, he stated he would describe himself as combining science and the art of practicing medicine.

In so doing, during his examination, and autopsy, he noted that the victim was found unclothed and bound at the crime scene. He was then looking for during his autopsy, number one, sperm; and number two, acid phosphatase. He rendered a medical opinion based upon these factors that placed the time of intercourse relative to the time of death.

He was not the first to do so. Dr. John Smialek, chief medical examiner, and Dr. Stephen Raddance (phonetic sp.), Assistant Chief Medical Examiner, signed an amendment to the autopsy, amendment to opinion of the autopsy. This was dated January 5, 2000, stating that "The deposition of seminal fluid occurred very close to or at the time of the death of the victim." They cited five peer reviewed articles to support their position regarding acid phosphatase and its relationship to the issues in this case. A review of these articles reveals that their conclusions are as the doctors found and relied upon.

Dr. Cina concurred with their opinion and placed the time at 6 to 12 hours, based upon the crime scene, the presence of sperm, and the high level of acid phosphatase. He also testified he saw no genital trauma and he stated he could not recall ever testifying prior to this regarding acid phosphatase.

Dr. Reich testified he is a Ph.D. forensic scientist. He was most clear and adamant that an opinion as to the time of intercourse relative to death could not be opined based upon the acid phosphatase test alone. He made sweeping statements that the acid phosphatase test cannot be used for this purpose and that is not accepted in the forensic scientist community. He worked hard to get in his testimony the buzz words of junk science, which I assume he knew were relevant from the case law.

He stated that no literature supports this conclusion and cited a 1992 peer reviewed article for support. It is important to understand that although two experts both testified as to acid phosphatase, their respective roles are much broader than this one area of overlap. Dr. Cina examines the body, considers the circumstances of death, how the body was found, and performs autopsies. Dr. Reich performs the tests upon the evidentiary items collected during the investigation and autopsy, albeit he was not the forensic scientist to run tests in this particular case.

25

The intersection or crossover of experts consists of only one of Dr. Cina's conclusions. Dr. Reich cannot opine regarding the art of medicine employed by Dr. Cina in coming to his conclusions. Based upon that alone, I could deny the defendant's motion.

However, looking at the acid phosphatase in particular, the question remains based upon Dr. Reich's testimony, can Dr. Cina refer to it at all in giving his opinion? As stated before, the amendment to the opinion signed by Dr. Smialek and Raddance [sic] referred to five articles from the 1970s to support their position. Dr. Reich referred to the 1992 article from Brazil to support his, as well as the general statement that no one supports the conclusion reached in the 1970s anymore.

There are two problems with this. First is the 2001 article from Dr. Kim Collins and Dr. Alan Bennett, which doctors seemed to testify in support of his position. This article discusses the relationship between finding sperm and elevated acid phosphatase in sexual assault cases. It concludes that this evidence is crucial to prove sexual assault when the evidence is retrieved post-mortem.

Also, the conclusion of the Brazil report is that their findings cast doubt on the validity of acid phosphatase in the determination of an estimate of post-coital time of death. This is a far cry from the words used by Dr. Reich and stated that acid phosphatase is junk science. In fact, the Brazil article inferentially states that the acid phosphatase test in establishing the time of intercourse before death is the method that is accepted by the scientific community and it is their report that casts doubt on whether it should be.

I have nothing before me which definitively states that the use of acid phosphatase is not recognized for this purpose. The evidence rather shows that it is. In fact, extrapolating the conclusions of the Brazil study, acid phosphatase is recognized in the medical and scientific community as the method of determining the time of intercourse prior to death. The fact that the Brazil study was done and its conclusion is it casts doubt merely recognizes the status of the test. This gives rise to the classic case of dueling experts whose opinions need to be argued to and considered by a jury.

Therefore, I find the State has met its burden, and I deny defendant's motion in limine.

After the close of evidence and before jury deliberation began, the trial judge provided the jury with an instruction regarding the use of the expert witness testimonies in the case:

26

Now, an expert is a witness who has knowledge, skill, experience, education or special training in a given field and therefore is permitted express opinions in that field. You should consider an expert's testimony together with all of the over evidence.

In weighing the opinion portion of an expert's testimony in addition to the factors that are relevant to any witness's credibility you should consider the expert's knowledge, skill, experience, training, or education as well as the expert's knowledge of the subject matter about which the expert is expressing an opinion. You should give expert the weight and value you believe it should have. You are not required to accept an expert's testimony even if it is uncontradicted.

As with any other witness, you may believe all, part or none of the testimony of an expert.

Harris, asserting error, citing *Blackwell v. Wyeth*, 408 Md. 575 (2009) and its progeny, asks us to reverse his conviction and to classify Dr. Cina's conclusion—that the presence of high levels of acid phosphatase found in the victim's vaginal cavity indicates that sexual activity occurred within hours of her death—as "junk science." Harris's reliance, however, is misplaced because, in *Blackwell*, the Court of Appeals held that the trial judge did not abuse his discretion by excluding expert testimony which failed to bridge the "analytical gap" between the data relied upon and the ultimate conclusion—that vaccines containing thimerosal were linked to autism in certain genetically susceptible individuals. In the present matter, no such analytical gap exists. The trial judge found that no evidence was adduced during the *Frye-Reed* hearing to demonstrate "that the use of acid phosphatase is not recognized for [the] purpose" of determining how close to death sexual intercourse occurred. He found Dr. Reich's testimony, which attempted to negate Dr. Cina's conclusion, to be a "far cry" from classifying it as "junk science," as the study upon which Dr. Reich relied "inferentially state[d] that the acid phosphatase test in establishing the time before death is the method that is accepted by the scientific community," although

27

it "cast doubt" on such practice. This is not a case where, like in *Blackwell*, the trial judge found bases to be lacking for the theory that thimerosal caused autism.

Rather, in the present case, Dr. Cina and Dr. Reich had been qualified as experts, pursuant to Maryland Rule 5-702.[11] The judge allowed them each to offer their conflicting conclusions to the jury, resulting in a "classic case of dueling experts whose opinions need to be argued to and considered by a jury." *See Roy v. Dackman*, 445 Md. 23, 51 n.16 (2015) (stating that an attempt to invalidate the entire basis of an expert's opinion based upon contrary studies from the one relied upon by the expert "is the grist for cross-examination and dueling experts and for resolution by the relative weight assigned by the fact-finder."); *Sugarman v. Liles*, 460 Md. 396, 413 (2018). The trial judge properly exercised his discretion in concluding that Dr. Cina's expert testimony juxtaposed by Dr. Reich's expert testimony provided the grist for the jury to best weigh. *See also United States v. Rodriguez*, 581 F.3d 775, 795 (8th Cir. 2009) (holding that questions about the factual basis for a time-since-intercourse theory, such as that proffered by Dr. Cina, goes "to credibility, not admissibility").

---

[11] Maryland Rule 5-702 provides that:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

28

Harris, nonetheless, without citation of authority, avers that, we should only consider Dr. Cina's testimony at the *Frye-Reed* hearing, not his testimony at trial because we are reviewing the trial court's denial of his motion to exclude. His contention, however, is without merit, because, unlike our review of the denial of a motion to suppress evidence, the trial judge did permit Dr. Cina's testimony at trial. Further, our review of the validity of an expert's testimony is not limited to the information contained in the record and should take notice of articles and other publications "which bear on the degree of acceptance by recognized experts that a particular process has achieved[,]" as well as judicial opinions on the matter and the like. *See Clemons v. State*, 392 Md. 339, 359 (2006) (quoting *Wilson v. State*, 370 Md. 191, 201 (2002)); *State v. Reed*, 283 Md. 374, 399 (1978).

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**